METROPOLITAN OPERA ASSOCIATION, INC., et al., Plaintiffs, and COLUMBIA RECORDS, INC., Intervener, Plaintiff, *v.* WAGNER-NICHOLS RECORDER CORPORATION et al., Defendants.

Supreme Court, Special Term, New York County, October 18, 1950.

*Leon Lauterstein, Lincoln W. Lauterstein, Jacob L. Isaacs* and *Paul C. Guth* for Metropolitan Opera Association, Inc., plaintiff.

*Joseph A. McDonald* for American Broadcasting Company, Inc., plaintiff.

*Godfrey Goldmark, Ralph F. Colin* and *Ambrose Doskow* for intervener, plaintiff.

*Bernard A. Green* for Wagner-Nichols Recorder Corporation and another, defendants.

GREENBERG, J. The plaintiffs Metropolitan Opera Association, Inc. (hereinafter referred to as Metropolitan Opera), and American Broadcasting Company, Inc. (hereinafter referred

to as American Broadcasting), and the intervening plaintiff, Columbia Records, Inc. (hereinafter referred to as Columbia Records), move for a preliminary injunction to restrain the defendants from recording, advertising, selling or distributing musical performances of Metropolitan Opera broadcast over the air, and from using the name " Metropolitan Opera " or any similar name which is calculated to mislead the public into believing that the records sold by the defendants are records of performances made or sold under the control or supervision or with the consent of the plaintiffs.

The defendants, by cross motion, seek: (1) A dismissal of the complaints on the ground that they fail to state facts sufficient to constitute a cause of action and are insufficient as matter of law; or (2) to compel the plaintiffs to serve an amended complaint which separately states and numbers the causes of action alleged; or (3) for a severance of the parties plaintiff and separate trials of their respective causes of action.

After the submission of these motions, upon its application, the plaintiff Columbia Records was granted leave to intervene and serve its complaint. The defendants' cross motion will therefore be treated as addressed to both the complaint of Metropolitan Opera and American Broadcasting and the complaint of the intervening plaintiff, Columbia Records.

The complaints of the plaintiffs allege in substance:

Metropolitan Opera is an educational membership corporation. Over a period of sixty years it has, by care, skill and great expenditure, maintained a position of pre-eminence in the field of music and grand opera. By reason of this skill and pre-eminence it has created a national and world-wide audience and thereby a large market for radio broadcasts and phonograph recordings of its performances. Metropolitan Opera has sold the exclusive right to broadcast its performances and the exclusive right to record its performances, as set forth below, and uses the proceeds to defray part of its operating expenses.

It has sold the exclusive right to make and sell phonograph records of its operatic performances and to use the names " Metropolitan Opera Orchestra," " Metropolitan Opera Chorus " and any other names identified with Metropolitan in connection with these phonograph records to Columbia Records, which has acquired a reputation and good will of great value. This contract is for a five-year period ending December 31, 1951. The exclusive nature of these rights is of the essence of the contract. In payment for these exclusive rights Metropolitan Opera receives royalties on records sold, with a guaranteed

minimum of $125,000 during the five-year term of the contract. Columbia Records is required to pay the entire cost of each performance of an opera which it records. Metropolitan Opera has reserved to itself the right to approve all phonograph records of its performances before they may be offered for sale to the public.

Pursuant to this contract Metropolitan Opera's performances of three operas have been recorded and are now being offered for sale and sold. Columbia Records has incurred very substantial expenses in making these recordings and in preparing for the recording of additional operas, and it has extensively advertised the records and its exclusive right to record Metropolitan Opera performances.

Metropolitan Opera has sold the exclusive right to broadcast its opera performances during the 1949–50 season to American Broadcasting, for which Metropolitan Opera receives $100,000. Under this contract American Broadcasting is prohibited from making recordings of such performances except for certain limited purposes related to broadcasting. Negotiations for a similar contract for the 1950–51 and 1951–52 opera seasons are in progress. Under the contract for the 1949–50 season, American Broadcasting broadcast Metropolitan Opera performances of eighteen operas between November 26, 1949, and March 25, 1950.

Since November 26, 1949, the defendants have recorded these broadcast performances of Metropolitan Opera and have used their master recordings to make phonograph records of Metropolitan Opera performances. The defendants have advertised and sold these records as records of broadcast Metropolitan Opera performances. By reason of this publicity and the reputation of Metropolitan Opera, these records have aroused wide interest. Since the defendants, unlike Columbia Records, pay no part of the cost of the performance of the operas and are held to no standard of artistic or technical excellence, they incur only the very small cost of recording these performances "off the air." The quality of their recordings is inferior to that of Columbia Records and is so low that Metropolitan Opera would not have approved the sale and release of such records to the general public. By reason of their negligible costs, defendants are able in competition with Columbia Records to sell their records at considerably less than those of the latter, with a consequent loss of revenue to Columbia Records and Metropolitan Opera.

By their activities the defendants have:

(1) Appropriated and exploited for their own benefit the result of the expenditures, labor and skill of Metropolitan Opera and American Broadcasting as embodied in the broadcast performances;

(2) Diminished the possibility of renewal of Metropolitan Opera's valuable contractual relations with American Broadcasting;

(3) Impaired Metropolitan Opera's revenues from the sale of authorized operatic recordings;

(4) Impaired the value of future exclusive recording privileges guaranteed by Metropolitan Opera;

(5) Wrongfully interfered with valuable contractual rights of the plaintiffs;

(6) Traded on and appropriated the value of the name and reputation for artistic excellence of Metropolitan Opera and appropriated the market created by Metropolitan Opera for defendants' phonograph records, and

(7) Endangered the reputation and good will of Metropolitan Opera and the sale of records of its performances by the sale of records of such low quality that Metropolitan Opera would not have approved their release to the public.

These activities of the defendants are continuing and will continue to have the same harmful effect on the plaintiffs.

The plaintiffs therefore ask for an injunction restraining the defendants:

(1) From using, recording, advertising, selling or distributing musical performances of the plaintiff Metropolitan Opera, broadcast over the air, or phonograph recordings thereof;

(2) From using the name " Metropolitan Opera " or the name " Metropolitan " or any similar name having the tendency to mislead the public into believing that the records sold by defendants are made in connection with or under the control and supervision of the plaintiffs or sold with their consent, and

(3) From using, recording, advertising or selling records of any performance broadcast over the facilities of American Broadcasting.

The complaints also ask for damages and for an accounting.

The defendants urge that the complaints fail to state a cause of action in that they do not allege the defendants are " palming off " their recordings as those of plaintiffs, or that plaintiffs are in competition with the defendants. They further urge that plaintiffs have no property right in the broadcast perform-

ances and that the defendants are therefore free to record these performances and sell their recordings.

The defendants' cross motion attacking the complaints must necessarily be considered first.

In passing upon the question of the sufficiency of a complaint alleging unfair competition it is helpful to bear in mind the origin and evolution of this branch of law. It originated in the conscience, justice and equity of common-law judges. It developed within the framework of a society dedicated to freest competition, to deal with business malpractices offensive to the ethics of that society. The theoretic basis is obscure, but the birth and growth of this branch of law is clear. It is an outstanding example of the law's capacity for growth in response to the ethical as well as the economic needs of society. As a result of this background the legal concept of unfair competition has evolved as a broad and flexible doctrine with a capacity for further growth to meet changing conditions. There is no complete list of the activities which constitute unfair competition (1 Nims on Unfair Competition and Trade-marks [4th ed., 1947], Chs. I, II; Handler, Unfair Competition, 21 Iowa L. Rev. 175; Schechter, The Rational Basis of Trademark Protection, 40 Harv. L. Rev. 813).

The statement of a sufficient cause of action in unfair competition, in the last analysis, is therefore dependent more upon the facts set forth and less upon technical requirements than in most causes of action. This may best be illustrated by a consideration of the objections raised by the defendants.

The defendants contend that no cause of action is stated due to the absence of an allegation of " palming off." One of the inferences which may fairly be drawn from the allegations of the complaint and the prayers for relief is that the activities of the defendants appropriate and trade on the name and reputation of Metropolitan Opera and tend to mislead the public into believing the recordings are made with the co-operation of Metropolitan Opera and under its supervision. However, even in the absence of such an inference the failure to allege " palming off " would not be a fatal defect. The early cases of unfair competition in which relief was granted were cases involving " palming off " — that is, the fraudulent representation of the goods of the seller as those of another. The early decisions condemning this practice were based on the two wrongs inflicted thereby: (1) The deceit and fraud on the public; and (2) the misappropriation to one person of the benefit of a name, reputa-

tion or business good will belonging to another (*Taylor* v. *Carpenter*, 3 Story 458 [U. S. Circuit Ct., Mass., 1844]; *Howard* v. *Henriques*, 3 Sandf. 725 [1851]).

With the passage of those simple and halcyon days when the chief business malpractice was " palming off " and with the development of more complex business relationships and, unfortunately, malpractices, many courts, including the courts of this State, extended the doctrine of unfair competition beyond the cases of " palming off." The extension resulted in the granting of relief in cases where there was no fraud on the public, but only a misappropriation for the commercial advantage of one person of a benefit or " property right " belonging to another.

The courts have used various formulae in making this extension. Many of the earlier of such decisions relied on the presence of special elements: For example, inducing breach of trust or breach of contract in misappropriating the property (*Board of Trade* v. *Christie Grain & Stock Co.*, 198 U. S. 236; *Bitterman* v. *Louisville & Nashville R. R. Co.*, 207 U. S. 205; *Sperry & Hutchinson Co.* v. *Mechanics' Clothing Co.*, 128 F. 800). However, in *Fonotipia, Ltd.* v. *Bradley* (171 F. 951) the Circuit Court, after reviewing these decisions, found there was unfair competition in a case of misappropriation even in the absence of any of the special factors. In that case the plaintiff had engaged artists and made recordings of their musical performance for sale to the public. The defendant obtained some of these recordings, mechanically reproduced them and sold the copies in competition with plaintiff's records at much lower prices. The court posed the question as follows (p. 959): " whether the taking of property in the shape of valuable ideas and products, by mechanical imitation or reproduction, is susceptible of notice by a court of equity, and whether any remedy therefor can exist apart from the questions of patent, trademark, and intentional deception or imitation and deceitful substitution of the product." It held, at page 964: " It cannot now be determined how far such appropriation of ideas could be prevented; but it would seem that where a product is placed upon the market, under advertisement and statement that the substitute or imitating product is a duplicate of the original, and where the commercial value of the imitation lies in the fact that it takes advantage of and appropriates to itself the commercial qualities, reputation, and salable properties of the original, equity should grant relief."

Subsequently, in 1918, the Supreme Court of the United States laid down a similar principle in *International News Service* v. *Associated Press* (248 U. S. 215). In that case the Associated Press sued to enjoin International News Service, among other things, from copying its news from bulletin boards and early editions of member newspapers and selling it bodily or in rewritten form to International News Service customers. The case presented particular difficulty because of the great public interest in the freest dissemination of the news. However, the court recognized that, as between the parties, even news was quasi-property.

In granting an injunction to the Associated Press against the pirating of its news the court held (p. 239, *et seq.*) : " The right of the purchaser of a single newspaper to spread knowledge of its contents gratuitously, for any legitimate purpose not unreasonably interfering with complainant's right to make merchandise of it, may be admitted; but to transmit that news for commercial use, in competition with complainant — which is what defendant has done and seeks to justify — is a very different matter. In doing this defendant, by its very act, admits that it is taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and which is salable by complainant for money, and that defendant in appropriating it and selling it as its own is endeavoring to reap where it has not sown, and by disposing of it to newspapers that are competitors of complainant's members is appropriating to itself the harvest of those who have sown. Stripped of all disguises, the process amounts to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not; with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gathering the news. The transaction speaks for itself, and a court of equity ought not to hesitate long in characterizing it as unfair competition in business. * * * It is said that the elements of unfair competition are lacking because there is no attempt by defendant to palm off its goods as those of the complainant, characteristic of the most familiar, if not the most typical, cases of unfair competition. * * * But we cannot concede that the right to equitable relief is confined to that class of cases. In the present case the fraud upon complainant's rights is more direct and obvious. Regarding news matter as

the mere material from which these two competing parties are endeavoring to make money, and treating it, therefore, as *quasi-property* for the purposes of their business because they are both selling it as such, defendant's conduct differs from the ordinary case of unfair competition in trade principally in this, that, instead of selling its own goods as those of complainant, it substitutes misappropriation in the place of misrepresentation, and sells complainant's goods as its own.''

The significance and limits of this decision have been widely discussed. That it extended the doctrine of unfair competition to cases based on misappropriation of property has been accepted by the leading authorities. Chief Justice HUGHES in *Schechter Poultry Corp.* v. *United States* (295 U. S. 495), stated at page 531: '' ' Unfair competition,' as known to the common law, is a limited concept. Primarily, and strictly, it relates to the palming off of one's goods as those of a rival trader * * *. In recent years, its scope has been extended. It has been held to apply to misappropriation as well as misrepresentation, to the selling of another's goods as one's own,— to misappropriation of what equitably belongs to a competitor. *International News Service* v. *Associated Press*, 248 U. S. 215, 241, 242.''

The doctrine of extending unfair competition beyond cases of '' palming off '' has similarly been recognized and applied by the courts of this State (*Allen Mfg. Co.* v. *Smith*, 224 App. Div. 187; *Rudolph Mayer Pictures* v. *Pathe News*, 235 App. Div. 774, explained in decision in *Madison Square Garden Corp.* v. *Universal Pictures Co.*, 255 App. Div. 459; *Mutual Broadcasting System* v. *Muzak Corp.*, 177 Misc. 489; *20th Century Sporting Club* v. *Transradio Press Service*, 165 Misc. 71). Thus an allegation of '' palming off '' is not essential to a cause of action for unfair competition.

The defendants also raise the objection that the complaint does not include an allegation that the parties are actual competitors. This objection is rendered untenable by the intervention of Columbia Records. However, again, the existence of actual competition between the parties is no longer a prerequisite) (*Tiffany & Co.* v. *Tiffany Productions*, 147 Misc., 679, affd. without opinion 237 App. Div. 801, affd. without opinion 262 N. Y. 482; *Long's Hat Stores Corp.* v. *Long's Clothes*, 224 App. Div. 497; *Marvlo Mills* v. *Marvel Mills*, 170 Misc. 770, affd. 258 App. Div. 715; *Triangle Publications* v. *Rohrlich*, 167 F. 2d 969; *Yale Electric Corp.* v. *Robertson*, 26 F. 2d 972; *Madison Square Garden Corp.* v. *Universal Pictures Co.*, 255 App. Div.

459, *supra; Maison Prunier* v. *Prunier's Restaurant & Cafe,* 159 Misc. 551, and cases cited therein).

The modern view as to the law of unfair competition does not rest solely on the ground of direct competitive injury, but on the broader principle that property rights of commercial value are to be and will be protected from any form of unfair invasion or infringement and from any form of commercial immorality, and a court of equity will penetrate and restrain every guise resorted to by the wrong-doer. The courts have thus recognized that in the complex pattern of modern business relationships, persons in theoretically noncompetitive fields may, by unethical business practices, inflict as severe and reprehensible injuries upon others as can direct competitors. That defendants' piratical conduct and practices have injured and will continue to injure plaintiffs admits of no serious challenge, and possible money damages furnishes no adequate remedy. That such practices constitute unfair competition both with Metropolitan Opera and Columbia Records is made abundantly clear by the record. Plaintiff Metropolitan Opera derives income from the performance of its operatic productions in the presence of an audience, from the broadcasting of those productions over the radio, and from the licensing to Columbia Records of the exclusive privilege of making and selling records of its own performances. Columbia Records derives income from the sale of the records which it makes pursuant to the license granted to it by Metropolitan Opera. Without any payment to Metropolitan Opera for the benefit of its extremely expensive performances, and without any cost comparable to that incurred by Columbia Records in making its records, defendants offer to the public recordings of Metropolitan Opera's broadcast performances. This constitutes unfair competition (*International News Service* v. *Associated Press,* 248 U. S. 215, *supra*).

The New York courts have applied the rule in the *International News Service* case in such a wide variety of circumstances as to leave no doubt of their recognition that the effort to profit from the labor, skill, expenditures, name and reputation of others which appears in this case constitutes unfair competition which will be enjoined (see, e.g., *Fisher* v. *Star Co.,* 231 N. Y. 414, 428; *Lehrenkrauss* v. *Universal Tours,* 262 N. Y. 332, 337; *Madison Square Garden Corp.* v. *Universal Pictures Co.,* 255 App. Div. 459, 464–465, *supra; Federal Waste Paper Corp.* v. *Garment Center Capitol,* 268 App. Div. 230, 234, affd. 294 N. Y. 714).

The defendants raise the further objection that the complaints fail to state a cause of action in that they set forth no property rights of the plaintiffs. Clearly, some property rights in the plaintiffs and interference with and misappropriation of them by defendants are necessary to a cause of action. However, "property rights," as has often been pointed out, are rights which are recognized and protected by the courts by excluding others therefrom. The designation is therefore more in the nature of a legal conclusion than a description.

The rights which the plaintiffs allege in their complaint are:

(1) The right of Metropolitan Opera to exclusive use, directly or indirectly, of the name and reputation which it has developed over a sixty-year period.

(2) The exclusive right of Metropolitan Opera to the productions which it creates by the use of its skill, artists, money and the organization it has developed.

(3) As a corollary of the latter the exclusive right to license the use of its performances and productions commercially in radio broadcasts, recordings and in other forms upon such terms as are agreed upon as to payments and the maintenance of artistic and technical standards in accord with the reputation of the Metropolitan Opera.

(4) The rights of plaintiffs Columbia Records and American Broadcasting being their exclusive recording and broadcasting rights derived from their agreements with Metropolitan Opera for which they have paid and in which they have invested substantial sums of money, time and skill.

The question presented is thus whether these rights are rights which the courts have recognized and protected and should recognize and protect as "property rights."

The Court of Appeals in *Fisher* v. *Star Company* (231 N. Y. 414, 429, *supra*) quoted with approval the broad definition of property rights laid down by the Supreme Court of the United States in the *International News Service* case (*supra*): " ' The rule that a court of equity concerns itself only in the protection of property rights treats any civil right of a pecuniary nature as a property right; and the right to acquire property by honest labor or the conduct of a lawful business is as much entitled to protection as the right to guard property already acquired. It is this right that furnishes the basis of the jurisdiction in the ordinary case of unfair competition.' "

The right to the exclusive use of one's own name and reputation has long been recognized by the courts, as evidenced by

the early protection of trade-marks and trade names and the " palming off " cases (*Maison Prunier* v. *Prunier's Restaurant & Cafe* (*supra*).

The law has also, as Justice BRANDEIS points out in his dissent in the *International News Service* case (*supra*), protected the creative element in intellectual productions — that is, the form or sequence of expression, the new combination of colors, sounds or words presented by the production. The production of an opera by an opera company of great skill, involving, as it does, the engaging and development of singers, orchestra, the training of a large chorus and the blending of the whole by expert direction into a finished interpretative production would appear to involve such a creative element as the law will recognize and protect against appropriation by others.

The performance of the opera in the opera house and the broadcast of the opera performance over the network of American Broadcasting under an exclusive broadcasting contract with Metropolitan Opera did not abandon the plaintiffs' rights to this performance. At common law the public performance of a play, exhibition of a picture or sale of a copy of the film for public presentation did not constitute an abandonment of nor deprive the owner of his common-law rights (*Palmer* v. *De Witt*, 47 N. Y. 532; *Ferris* v. *Frohman*, 223 U. S. 424; *American Tobacco Co.* v. *Werckmeister*, 207 U. S. 284; *Universal Film Mfg. Co.* v. *Copperman*, 218 F. 577). In the *International News Service* case (248 U. S. 215, *supra*) the court in discussing this question of publication and abandonment stated (pp. 240-241) : " The contention that the news is abandoned to the public for all purposes when published in the first newspaper is untenable. Abandonment is a question of intent, and the entire organization of the Associated Press negatives such a purpose. The cost of the service would be prohibitive if the reward were to be so limited. * * * Their [by-laws] effect is that publication by each member must be deemed not by any means an abandonment of the news to the world for any and all purposes, but a publication for limited purposes; for the benefit of the readers of the bulletin or the newspaper as such; not for the purpose of making merchandise of it as news, with the result of depriving complainant's other members of their reasonable opportunity to obtain just returns for their expenditures."

In the light of these cases the performance of operas by Metropolitan Opera and their broadcast over the network of American Broadcasting cannot be deemed a general publication or abandonment so as to divest Metropolitan Opera of all of its rights

to the broadcast performances. The care with which the Metropolitan Opera made its limited grants, granting exclusive right to a single network and restricting the latter's right to record and granting exclusive rights to record to Columbia Records, again reserving the right to approve all records before their release, shows clearly no intent to abandon but, on the contrary, an attempt to retain effective control over the broadcasting and recording of its performances. The fact that performances today can take place over the radio as well as in the theatre and thereby reach a wider audience does not change the principle involved. The publication in this case is certainly no wider nor more unlimited than the publication of news in Associated Press member newspapers and bulletins which was held by the Supreme Court of the United States to constitute limited publication.

Rights of a similar nature have been repeatedly recognized and upheld by the courts. As has been stated before, the doctrine is a broad and flexible one. It has allowed the courts to keep pace with constantly changing technological and economic aspects so as to reach just and realistic results.

In *Fisher* v. *Star Co.* (231 N. Y. 414, *supra*) the Court of Appeals, after quoting the broad definition of a property right by the Supreme Court of the United States, upheld the exclusive right of a cartoonist to the use of cartoon characters he had created in the newspapers. The court enjoined the defendants from using " Mutt and Jeff " in connection with cartoons not drawn by the plaintiff. The reasoning of the court is of interest. It stated at page 433: " If appellant's employees can so imitate the work of the respondent that the admirers of ' Mutt and Jeff ' will purchase the papers containing the imitations of the respondent's work, it may result in the public tiring of the ' Mutt and Jeff ' cartoons by reason of inferior imitations or otherwise, and in any case in financial damage to the respondent and an unfair appropriation of his skill and the celebrity acquired by him in originating, producing and maintaining the characters and figures so as to continue the demand for further cartoons in which they appear." The reasoning is also applicable to the instant case.

In *Rudolph Mayer Pictures* v. *Pathe News* (235 App. Div. 774, *supra*) the court protected the exclusive right which plaintiff had obtained from the Dodger Athletic Club, lessee of Ebbets Field, to take and sell motion pictures of the Sharkey-Walker contest. The court affirmed without opinion a preliminary injunction enjoining the defendants from distributing pictures

it had taken of the boxing match. The court in its later decision in *Madison Square Garden Corp.* v. *Universal Pictures* (255 App. Div. 459, *supra*) referring to this case, stated at page 465: "Defendants argued that plaintiffs had no property right which could be protected; that the right to take photographs of a boxing match was not a form of property known to the law, and that defendants' acts did not constitute unfair competition. In overruling these contentions, we necessarily held that the defendants had violated a property right and should be enjoined."

Again, in its decision in the *Madison Square Garden Corp.* case (*supra*) the court upheld the plaintiff's right to exclusive use and benefit of the reputation and good will the plaintiff had built up and to the business it had built up licensing the use of genuine photographs of Madison Square Garden. The plaintiff had brought an action for unfair competition against the defendant, alleging defendant had produced and distributed a picture which used some pictures of the "Rangers" team taken in another city for newsreel purposes only and created the impression that the background of the picture was Madison Square Garden. In reversing the lower court decision dismissing the complaint the court held the complaint sufficiently alleged a misappropriation of plaintiff's property rights. The court stated (p. 466 *et seq.*): "The plaintiff clearly had a property right in its good name, its reputation, its good will built up at considerable expense, and its business in licensing genuine moving picture photographs to be used in feature films from which it had derived a substantial revenue." And at page 467: "A court of equity acts to promote honesty and fair dealing as well as to protect the purchasing public and the property rights of individuals. The evident purpose of these defendants in using pictures of plaintiff's team and referring in their publicity to the scene of their drama as Madison Square Garden in New York City was to appropriate the financial value such team and name had acquired through the plaintiff's labor, expenditure and skill. The novelty and ingenuity of the method defendants employed in achieving that result will not deter the court from action. There may be unfair competition by misappropriation as well as by misrepresentation. Both elements are here. Equity is not concerned about the means by which fraud is done; it deals with the results arising from the fraud."

In *Mutual Broadcasting System* v. *Muzak Corp.* (177 Misc. 489, *supra*) the court protected plaintiff's exclusive right to broadcast the 1941 World Series and enjoined the defendant from

transmitting plaintiff's broadcast to its subscribers. The defend-
ant argued that there was no encroachment on plaintiff's right
because it did not attempt to palm off the broadcast as its own,
but gave full credit to the defendant. The court granted an
injunction, holding that the plaintiff's exclusive right had been
invaded by the defendant.

Also in *Twentieth Century Sporting Club* v. *Transradio Press
Service* (165 Misc. 71, *supra*) the court protected the exclusive
right of the plaintiff to broadcast a description of a boxing
exhibit. The plaintiff club had granted exclusive right to broad-
cast the boxing match to the plaintiff National Broadcasting
Company. The court granted an injunction against the defend-
ants' broadcasting up-to-the-minute descriptions, stating that
such action would constitute an unlawful appropriation of the
exclusive property rights of the plaintiffs.

In *Pittsburgh Athletic Co.* v. *KQV Broadcasting Co.* (24 F.
Supp. 490), the court sustained the exclusive right of the plain-
tiff to control the broadcasting of descriptions of baseball games
played in the plaintiff's park by the plaintiff's team. The court
enjoined the defendants from broadcasting play-by-play descrip-
tions of the baseball game, in violation of the exclusive right the
plaintiff had granted to General Mills, Inc., and the National
Broadcasting Company. The court, in its conclusions of law,
stated (p. 493 *et seq.*): "2. The right, title and interest in and
to the baseball games played within the parks of members of
the National League, including Pittsburgh, including the prop-
erty right in, and the sole right of, disseminating or publishing
or selling, or licensing the right to disseminate, news, reports,
descriptions, or accounts of games played in such parks, during
the playing thereof, is vested exclusively in such members.
3. The actions and threatened actions of the defendant con-
stitute a direct and irreparable interference with, and an appro-
priation of, the plaintiffs' normal and legitimate business; and
said action is calculated to, and does, result in the unjust enrich-
ment of the defendant at the expense of the plaintiffs and each
of them. 4. The defendant's unauthorized broadcasts of infor-
mation concerning games played by the Pittsburgh team con-
stitute unfair competition with the plaintiffs and each of them.
5. The defendant wrongfully deprives the plaintiffs and each of
them of the just benefits of their labors and expenditures in
respect of the baseball games and the public dissemination of
news thereof as alleged in the complaint; and the action, threat-
ened action and practice of the defendant constitute a fraud on
the public."

There is no reason apparent to this court why the rights of a nonprofit organization sponsoring one of the arts should receive less protection than those of the sponsor of sporting events. The law at least regards both these diverse facets of human endeavor with impartial and approving judgment. The fostering and encouragement of fine performances of grand opera, and their preservation and dissemination to wide audiences by radio and recordings are in the public interest. The Metropolitan Opera, over a period of sixty years, has developed one of the finest, if not the finest, opera companies available to Americans. Through the media of recordings and broadcasts, an avenue of culture has been opened to vast numbers of Americans who have been able to enjoy the fruits of this great enterprise. To many, it is the only available source of grand opera. To refuse to the groups who expend time, effort, money and great skill in producing these artistic performances the protection of giving them a " property right " in the resulting artistic creation would be contrary to existing law, inequitable, and repugnant to the public interest. To hold that the broadcasts of these performances, making them available to a wider audience of Americans, deprives the Metropolitan Opera of all of its rights in this production and abandons the production to anyone to appropriate and exploit commercially, would indeed discourage the broadcasting of such operas and penalize not only the Metropolitan Opera but the public which now benefits from these broadcasts. Equity will not bear witness to such a travesty of justice; it will not countenance a state of moral and intellectual impotency. Equity will consider the interests of all parties coming within the arena of the dispute and admeasure the conflict in the scales of conscience and on the premise of honest commercial intercourse.

The complaints can also be sustained as stating a cause of action for unjustifiable interference with contractual rights of the plaintiffs. With full knowledge of the contract by which Metropolitan Opera has granted to Columbia Records the exclusive privilege of recording Metropolitan operas, the defendants have assumed the exercise of that privilege. Their action not only constitutes an attempt to secure the very benefit which the contract grants to Columbia Records, but also an interference with contractual relations which will be enjoined by a court of equity (*Reiner* v. *North Amer. Newspaper Alliance,* 259 N. Y. 250; *Navarro* v. *Fiorita,* 271 App. Div. 62, affd. 296 N. Y. 783; *Gonzales* v. *Kentucky Derby Co.,* 197 App. Div. 277, affd. 23? N. Y. 607; *Pittsburgh Athletic Co.* v. *KQV Broadcasting Co*

*supra*). The rule enunciated in these cases has been aptly summed up in 41 Harvard Law Review (pp. 731–732) as follows: " And today there is no question but that there may be *prima facie* liability for interference with contract relations without inducing breach of contract by, for example, injuring persons under contract so that they are disabled from performing, or by destroying or damaging property which is the subject matter of a contract, or by doing other acts which make performance more burdensome, difficult or impossible or of less or no value to the one entitled to performance."

The present defendants' conduct interferes with Columbia Records' enjoyment of the benefits of its exclusive contract as plainly as if the defendants had persuaded Metropolitan Opera to break its contract with Columbia Records by granting to them the privilege of recording Metropolitan Opera performances. The right of the parties to protect their interest in that contract against interference by the intentional acts of third parties is not limited by the analogies of common-law property rights.

There can be no question that the contract between Metropolitan Opera and Columbia Records, by which each party made important business commitments and parted with valuable consideration, is fully enforcible between the two companies. If Metropolitan Opera had purported to grant to the defendants or to any other party the privilege which the defendants have taken to themselves, a court of equity would certainly enjoin it from doing so. Conversely, if Columbia Records had repudiated the contract there is no doubt that Metropolitan Opera could enforce it.

This same principle is affirmed in *Gonzales* v. *Kentucky Derby Co.* (197 App. Div. 277, affd. 233 N. Y. 607, *supra*); and *Pittsburgh Athletic Co.* v. *KQV Broadcasting Co.* (24 F. Supp. 490, *supra*).

The foregoing discussion of the facts also leads to the conclusion that the assertion by the plaintiffs of a single cause of action and the joinder of the parties is not only proper but is desirable, in view of the common rights and common questions of law involved (Civ. Prac. Act, § 212, subd.1).

Defendants' cross motion is therefore denied.

We come next to the original motion: The motion by the plaintiffs for a preliminary injunction. The affidavits presented upon this motion establish that the defendants have, under the facade of a Home Recordists' Guild, made recordings of broadcast performances of Metropolitan Opera and have sold these

records to the public for their own commercial profit. They have advertised these records as recordings of the Metropolitan Opera expressly or by unmistakable implication, thus capitalizing on the name and the reputation of the Metropolitan Opera and the public interest in its performances. These recordings have been made without any supervision or control on the part of Metropolitan Opera, and the evidence shows that the quality of the records is inferior to the recordings made by Columbia Records from " live " performances and is inferior to that of any records which the Metropolitan Opera approves for release to the public as an example of its work.

The new opera season is about to begin. The position taken by the defendants shows clearly that they intend to continue to record the broadcast performances of the Metropolitan Opera productions and to sell these recordings to the public, as they have been doing. The almost certain prospect of these activities on the part of the defendants has prevented the conclusion of a new contract between the Metropolitan Opera and American Broadcasting for exclusive broadcasting rights for the 1950–51 season. Unless this contract can be concluded within the next few weeks, Metropolitan Opera will lose the financial and other benefits from the sale of these rights and the broadcasting of their performances.

The prospect of defendants' continued activities in making and releasing the cheaper " off the air " recordings of the Metropolitan Opera during the coming season has also placed in jeopardy the program of recording several new operas which Columbia Records has planned at considerable expense for the last year of its contract with Metropolitan Opera. Unless the defendants are enjoined before the season starts, Metropolitan Opera is likely to lose the major part of its royalties from the sale of the authorized records, and the Columbia Records will similarly suffer a serious loss.

The continuance of defendants' activities during this coming season is also likely to cause to the Metropolitan Opera an irreparable harm far beyond even the damage to the present contracts for its broadcasting and recording rights. The release and sale of recordings of Metropolitan Opera performances unapproved as to quality and unlimited as to amount, yet clearly designated or known to be performances of Metropolitan Opera, may injure the reputation Metropolitan Opera has built up by so much travail and may seriously damage or glut the market for its works.

This consideration of irreparable harm to the plaintiffs must necessarily outweigh the financial loss to defendants resulting from not being able to appropriate these performances for their own commercial benefit upon commencement of the new opera season. Such injury as may be inflicted on the defendants is the direct result of their unconscionable business practices and their invasion of the moral standards of the market place. The cry of the defendants that others similarly transgress does not confer immunity on them for their forbidden activities, nor may they find solace in the claim that they have not been guilty of common-law fraud. It already appears that this is not necessary. They have embarked upon a hazardous enterprise which equity will not hesitate to strike down. Cast in its proper environment, we have here a business venture purposed to gather in the harvest the seeds of which were planted and nurtured by others at great expense and with consummate skill.

The conclusion here reached is not an onslaught on the currents of competition; it does not impose shackles on the arteries of enterprise. It simply quarantines business conduct which is abhorrent to good conscience and the most elementary principles of law and equity.

The preliminary injunction is granted. Bond is fixed in the sum of $2,500. Settle order.