MERCURY RECORD PRODUCTIONS, INC., and others, Appellants, v. ECONOMIC CONSULTANTS, INC., d/b/a E–C TAPE SERVICE, and others, Respondents.*

*No. 606. Argued May 6, 1974.—Decided June 17, 1974.*
(Also reported in 218 N. W. 2d 705.)

---

\* Motion for rehearing denied, with costs, on September 4, 1974.

166

For the appellants there were briefs by *Quarles & Brady* of Milwaukee, attorneys; *Ronald L. Piette* of Milwaukee, *Howard S. Smith* and *Mitchell, Silberberg & Knupp*, all of Los Angeles, California, of counsel; and oral argument by *Charles Q. Kamps* of Milwaukee, and *Howard S. Smith*.

For the respondents there was a brief by *Charne, Glassner, Tehan, Clancy & Taitelman, S. C.,* of Milwaukee, and oral argument by *William E. Glassner.*

HEFFERNAN, J.

### *Cause of action for unfair competition*

In their complaint and amended complaint, plaintiffs base their action on common-law copyright, unfair competition, and unjust enrichment. On appeal, however, plaintiffs rely exclusively on unfair competition, with the exception of one paragraph in their original brief which discusses common-law copyright. We consider the other grounds abandoned.

Prior to *International News Service v. Associated Press* (1918), 248 U. S. 215, 39 Sup. Ct. 68, 63 L. Ed. 211 (hereinafter referred to as *I. N. S.*), the three elements of a cause of action for unfair competition were (1) appropriation of the plaintiff's production, (2) competition between plaintiff and defendant, and (3) "passing off"— the latter referring to misrepresentation by the defendant that the plaintiff's product was the defendant's. Goldstein, *Federal System Ordering of the Copyright Interest,* 69 Columbia Law Rev. (1969), 49, 58.

*I. N. S.* eliminated "passing off" as a requirement and:

". . . postulated a new concept of unfair competition in focusing upon the competitive relationship and stressing the reciprocal rights and duties that are peculiar to it and emanate from it." 2 Callman, *The Law of Unfair Competition, Trademarks and Monopolies* (3d ed. 1968), p. 509, sec. 60.3.

The majority in *I. N. S.* recognized two new causes of action differing from the "passing off" doctrine, "causes of action based upon the misappropriation and the exploitation of a competitor's business values." Callman, p. 509, sec. 60.3.

The elements of the misappropriation cause of action developed in *I. N. S.* are: (1) time, labor, and money expended in the creation of the thing misappropriated; (2) competition; and (3) commercial damage to the plaintiff. Note, *Goldstein v. California: A New Outlook For the Misappropriation Doctrine,* 8 Univ. of San Francisco Law Rev. (1973), 199, 201 and Comment, *Performers' Rights and Copyright: The Protection of Sound Recordings from Modern Pirates,* 59 Cal. Law Rev. (1971), 548, 552.

In *I. N. S.,* the Associated Press sought an injunction against its news gathering competitor, the International News Service, to restrain I. N. S. from appropriating news from the early editions of A. P. papers and disseminating that news as I. N. S.' to I. N. S.' subscribing papers. The United States Supreme Court affirmed the Court of Appeals' injunction against I. N. S. The court said:

"In doing this [*i.e.,* transmitting the news from A. P. papers for commercial use, in competition with A. P.] defendant [I. N. S.], by its very act, admits that it is taking material that has been acquired by complainant [A. P.] as the result of organization and the expenditure of labor, skill, and money, and which is salable by complainant for money, and that defendant in appropriating it and selling it as its own is endeavoring to reap where it has not sown, and by disposing of it to newspapers that are competitors of complainant's members is appropriating to itself the harvest of those who have sown. Stripped of all disguises, the process amounts to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not; with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gathering the news. The transaction speaks for itself, and a court of equity ought not to hesitate long in characterizing it as unfair competition in business.

"The underlying principle is much the same as that which lies at the base of the equitable theory of consideration in the law of trusts—that he who has fairly paid the price should have the beneficial use of the property." (Pp. 239, 240)

Thus, the essence of the cause of action in misappropriation is the defendant's use of the plaintiff's product, into which the plaintiff has put time, skill, and money; and the defendant's use of the plaintiff's product or a copy of it in competition with the plaintiff and gaining an advantage in that competition because the plaintiff, and not the defendant, has expended the energy to produce it. The wrong is not in the copying, but in the appropriation, of the plaintiff's time, effort, and money.

Relying on *I. N. S.,* appellate courts in five jurisdictions have enjoined the actions of record pirates: *Capitol Records, Inc. v. Erickson* (1969), 2 Cal. App. 3d 526, 532, 82 Cal. Rptr. 798, certiorari denied (1970), 398 U. S. 960, 90 Sup. Ct. 2176, 26 L. Ed. 2d 545; *Capitol Records v. Spies* (1970), 130 Ill. App. 2d 429, 432, 264 N. E. 2d 874; *National Broadcasting Co., Inc. v. Nance* (Mo. Ct. of App. 1974), 506 S. W. 2d 483, 484, 485; *Liberty/UA, Inc. v. Eastern Tape Corp.* (1971), 11 N. C. App. 20, 22, 180 S. E. 2d 414, certiorari denied (1971), 278 N. C. 702, 181 S. E. 2d 600; and *Columbia Broadcasting System, Inc. v. Custom Recording Co., Inc.* (1972), 258 S. C. 465, 478, 189 S. E. 2d 305, certiorari denied (1972), 409 U. S. 1007, 93 Sup. Ct. 437, 34 L. Ed. 2d 300.

New York has also enjoined record piracy on the basis of *I. N. S. See, Capitol Records, Inc. v. Greatest Records, Inc.* (Sup. Ct. 1964), 43 Misc. 2d 878, 252 N. Y. Supp. 2d 553, relying on *Metropolitan Opera Asso., Inc. v. Wagner-Nichols Recorder Corp.* (Sup. Ct. 1950), 199 Misc. 786, 101 N. Y. Supp. 2d 483, affirmed (1951), 279 App. Div. 632, 107 N. Y. Supp. 2d 795, relying on *I. N. S.*

In *Erickson* and *Eastern Tape,* the California and North Carolina courts affirmed the lower courts' injunc-

tions, whereas in *Spies, Nance,* and *Custom Recording,* the Illinois, Missouri, and South Carolina courts reversed the lower court rulings and ordered the granting of injunctions. In each of the five cases, the courts relied on common-law unfair competition to order the injunctions, there being no statutes on which to rely.

The unfair competition-misappropriation theory applied in *I. N. S.* and the other jurisdictions comports with the theory applied by this court in *J. I. Case Plow Works v. J. I. Case Threshing Machine Co.* (1916), 162 Wis. 185, 201, 155 N. W. 128, where, in the action for alleged unfair competition in trade, the court said:

"The legal principles which are controlling here are simply the principles of old-fashioned honesty. One man may not reap where another has sown nor gather where another has strewn."

This is the standard applied in *I. N. S., supra.* That standard is consistent with the public policy of the state of Wisconsin as stated in sec. 100.20 (1), Stats. 1971:

"Methods of competition in business and trade practices in business shall be fair. Unfair methods of competition in business and unfair trade practices in business are hereby prohibited."

We consider it immaterial that the Department of Agriculture, which has jurisdiction over rules in this area, has failed to act. The position of *I. N. S.* is consistent with both the common-law policy of this state as enunciated in *J. I. Case, supra,* and the legislative policy spelled out in the cited statute. In the absence of clear and convincing authority to the contrary, it would be improper for this court to conclude that any other rule than that stated in *I. N. S.* should be applied to this case.

The defendants, however, assert several reasons why the *I. N. S.* rule should not be applied. Defendants contend:

1. States can constitutionally regulate record piracy only by statute, not by common law.

2. *I. N. S.* has been overruled, or at least has been severely restricted.

3. After the sale of their records, plaintiffs have no property interest in them to protect.

4. Re-release of old songs by plaintiffs after February 15, 1972, subjects those songs to federal protection and removes them from state protection.

5. For policy reasons, the courts should defer to the legislature in the control of record piracy.

*State regulation by statute vis-a-vis common law*

*Sears, Roebuck & Co. v. Stiffel Co.* (1964), 376 U. S. 225, 84 Sup. Ct. 784, 11 L. Ed. 2d 661, and *Compco Corp. v. Day-Brite Lighting, Inc.* (1964), 376 U. S. 234, 84 Sup. Ct. 779, 11 L. Ed. 2d 669, are relied upon by defendants. In each case, plaintiffs sued the defendants in federal courts in Illinois alleging unfair competition because the defendants manufactured copies of plaintiffs' products—a pole lamp in *Sears*, and a fluorescent lighting fixture in *Compco*. In each case, the plaintiff had obtained a patent, but it was held invalid by the district courts. *Sears*, at page 226; *Compco*, at page 235. The United States Supreme Court held that plaintiffs could not maintain their actions based on state unfair competition law, because the federal patent law, under the Supremacy Clause, was controlling. The court concluded that the patent system used uniform federal standards to promote invention and preserve free competition and, under the Supremacy Clause, state unfair competition laws could not be permitted to give protection that clashed with the objectives of the federal patent laws. *Sears*, at pages 230, 231.

In *Goldstein v. California* (1973), 412 U. S. 546, 93 Sup. Ct. 2303, 37 L. Ed. 2d 163, the petitioners therein were convicted of record piracy under the California penal statute. Relying on *Sears* and *Compco*, the petitioners argued that federal copyright law pre-empted the field, thus invalidating the state law. The supreme court held that the constitution neither explicitly precludes states from granting copyrights, nor grants such authority exclusively to the federal government. *Goldstein*, at page 560. The court affirmed the convictions and concluded that California, in enacting the law, had exercised a power it retained under the constitution and that the statute did not intrude into an area which Congress had pre-empted.

The court held that Congress had not pre-empted the the area, because, until 1972, the federal Copyright Act provided no protection for sound recordings. *Goldstein*, at 562, 563, fn. 17. Such protection was afforded for the first time in 1971, when Congress enacted Public Law 92–140, which extends copyright protection to sound recordings "fixed, published, and copyrighted" after February 15, 1972. Public Law 92–140, sec. 3, 85 U. S. Stats. at Large 391, 392. The instant case deals only with recordings before that date.

Defendants interpret *Goldstein* narrowly and argue that it permits states to provide copyright or similar protection only by statute. Defendants argue that, without a statute, *Sears* and *Compco*—expressly reaffirmed, where applicable, by *Goldstein*—still preclude protection under common law.

We conclude, however, that *Goldstein* permits state protection by common law as well as by statute. In *Goldstein*, the court pointed out that, in *Sears* and *Compco*, state unfair competition laws could not be used to prevent copying of articles, because application of the state law upset the careful balance Congress had drawn, and they must necessarily give way under the Supremacy

Clause. *Goldstein,* at pages 569, 570. The *Goldstein* court pointed out that such a conflict does not arise in the case of recordings of musical performances, because in this category of "Writing," Congress has not drawn a balance. *Goldstein,* at page 570.

Such is the fact in the instant case. No federal scheme has been devised that is applicable to the subject matter of this action. At least there had been none until the law effective in 1972. Under *Goldstein,* a state is free to apply its own law.

Moreover, *Goldstein* made clear that Public Law 92–140 did not indicate a congressionally determined balance as to recordings made prior to February 15, 1972. In sec. 3 of that act, Congress said that nothing in the act "shall be applied retroactively or be construed as affecting in any way any rights with respect to sound recordings fixed before" February 15, 1972. 85 U. S. Stats. at Large 392. *Goldstein,* at pages 551, 552.

Under the standards of *Goldstein,* state law may be applied. We see no indication that the United States Supreme Court put its imprimatur on statutory law, but not upon the power of a common-law court acting in accordance with the accepted public policy of its state. The same conclusion was reached in *Jondora Music Publishing Co. v. Melody Recordings, Inc.* (D. C. D. N. J. 1973), 362 Fed. Supp. 494, 497; Note, *Copyrights: States Allowed to Protect Works Not Copyrightable Under Federal Law,* 58 Minn. Law Rev. (1973), 316, 324; and Note, 8 Univ. of San Francisco Law Rev., *supra,* 199, 211.

Defendants also argue that the compulsory licensing provision indicates congressional intent that the only person with a property interest in a song is the composer. The compulsory licensing statute (17 USC, sec. 1 (e)) [4] provides that, once a composer permits his song to be

---

[4] *See* footnote 2 for the relevant portion of 17 USC, sec. 1 (e), 1970.

recorded, anyone else may record the song if he pays the composer two cents for each record manufactured.

Under *Goldstein,* defendants obtain no solace under the compulsory licensing statute. In *Goldstein,* in footnote 23 at pages 566 and 567, the court noted that the compulsory licensing statute did not provide the direct conflict necessary to render the California statute invalid. Thus, the compulsory licensing statute does not show congressional intent to pre-empt state control in other respects involving unfair competition.

### *I. N. S.—overruled or restricted*

Defendants argue that *Sears* and *Compco* undercut *I. N. S.,* and the trial judge said that those two cases "have been said to overrule I. N. S." The basis for these assertions was explained in *International Tape Manufacturers Asso. v. Gerstein* (D. C. S. D. Fla. 1972), 344 Fed. Supp. 38, 50, wherein the court said:

". . . *Sears* and *Compco* seemed to undercut *International News Service* by prohibiting states from providing effective civil or criminal remedies to sound recording owners . . . ."

*Goldstein,* however, has resolved the question in favor of the vitality of *I. N. S.,* because it permits states to protect sound recordings under the law of unfair competition.

Defendants argue that *I. N. S.* should be restricted in its application and limited to its facts, citing *Speedry Products, Inc. v. Dri Mark Products, Inc.* (2d Cir. 1959), 271 Fed. 2d 646; *G. Ricordi & Co. v. Haendler* (2d Cir. 1952), 194 Fed. 2d 914; *Cheney Bros. v. Doris Silk Corp.* (2d Cir. 1929), 35 Fed. 2d 279; and *Desclee & Cie, S. A. v. Nemmers* (D. C. E. D. Wis. 1961), 190 Fed. Supp. 381.

It should first be noted that Judge LEARNED HAND authored the opinions in *Cheney and Ricordi; Speedry*

is also a Second Circuit case; and *Desclee,* at page 388, relies on *Speedry* and *Ricordi* in criticizing *I. N. S.* Thus, it seems safe to say that defendants' criticism of *I. N. S.* is based on the theories of Judge HAND.

Judge HAND's position is explained in *Goldstein: Federal System Ordering of the Copyright Interest,* 69 Columbia Law Rev. (1969), 49, 51, 52. The author points out that Judge HAND considered anathema the possibility of perpetual protection by the states of works not protected by the Copyright Act but subject to possible protection as a "Writing" under the constitution.[5] He contends that:

"Hand's position depends upon two predicates: that the copyright clause operates of its own force and independent of the need for statutory artification—that, by authorizing Congress to regulate Writings, the clause requires that, as to all Writings, only federal, and not state, rule-making authority applies. Second, the copyright statute constitutes a consciously ordered scheme and that any omission from it 'must be taken to have been as deliberate as though it were expressed. . . .' [Quoted from *Cheney,* at p. 281] Constitutional Writings deemed by Congress to be unworthy of statutory copyright— *e.g.* phonograph records and dress designs—may not, then, be afforded perpetual protection by the states as this would conflict with the limited times restriction of the Constitution."

Judge HAND expressed these ideas in *Cheney* when he said *I. N. S.* covered no more than situations substantially similar to those then at bar. *Cheney,* page 280. He said he could not suppose the court meant in *I. N. S.* to create a common-law patent or copyright, because that would

---

[5] Art. I, sec. 8, clause 8, of the United States Constitution provides:

"The Congress shall have power . . . To promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries . . . ."

conflict with the scheme Congress had devised for the subject matter for more than a century. *Cheney,* page 280. Judge HAND was also critical of the possibility of extending perpetual protection to the author, because that was more than the constitution allowed. *Cheney,* page 280. Finally, Judge HAND stated that omissions in the law must be taken as deliberate. *Cheney,* page 280.

*Goldstein v. California, supra,* undercut the predicates of Judge HAND's theory. Whereas, Judge HAND believed the copyright clause in the constitution ipso facto precluded state protection, the court made it clear in *Goldstein* that states can act unless there is an indication Congress intended to pre-empt the field with the statutory Copyright Act. *Goldstein* repudiated Judge HAND's position by permitting the California statute to stand. While Judge HAND believed the copyright statute was a consciously ordered scheme and all omissions were deliberate, *Goldstein* said Congress had left the area of sound recordings unattended. *Goldstein,* at page 570. Thus, the court did not view Congress' inaction as the deliberate decision to leave the field of sound recordings free from restraint. Although Judge HAND did not believe in perpetual protection, *Goldstein* said that the limited times clause did not apply to the states. *Goldstein,* at pages 560, 561.

*Goldstein* completely repudiates Judge HAND's rationale criticizing *I. N. S.* Accordingly, the line of precedents originating with Judge LEARNED HAND no longer constitutes controlling authority, *I. N. S.* stands.

### *Plaintiff's property interest*

Defendants contend that, after plaintiffs sell their records, they have no property interest in them to be protected. Defendants argue that application of the unfair competition doctrine would create a "perpetual copy-

right" in favor of the plaintiffs and give them the power to forever exclude third persons from copying the works they have promulgated.

The court disposed of a similar argument in *I. N. S.*, when it said:

"The question here is not so much the rights of either party as against the public but their rights as between themselves. . . . And although we may and do assume that neither party has any remaining property interest as against the public in uncopyrighted news matter after the moment of its first publication, it by no means follows that there is no remaining property interest in it as between themselves." (P. 236)

In the instant case, then, this court need not decide that plaintiffs retain a property interest as against the buying public in order to hold in favor of the plaintiffs' cause of action. The property interest protected is plaintiffs' professional investment of time, skill, and money in the recordings. Recognizing a cause of action in unfair competition for the plaintiffs gives the plaintiffs protection against defendants' appropriation, the larceny, of plaintiffs' efforts.

In *Goldstein*, the court explained that, although the state may grant an exclusive right as against misappropriations, that right is limited to the borders of that state.

"Consequently, even when the right is unlimited in duration, any tendency to inhibit further progress in science or the arts is narrowly circumscribed." *Goldstein*, at page 561.

The trial judge attempted to distinguish *I. N. S.* from the instant case on the ground the injunction in *I. N. S.* restrained International News Service from gainfully using the Associated Press' news " '*until its commercial value as news to the complainant and all of its members has passed away.*' " *I. N. S.*, at page 245. He stated it

was too big a leap to go from that limited injunction of *I. N. S.* to conferring a common-law right on property. Here, the leap, however, is a logical step.

In *I. N. S.*, the injunction was denominated as temporary—until the news value was lost. Practically, the injunction was permanent, because it ceased only when the news was valueless to either A. P. or the misappropriator. Here, the injunction need only be maintained until the commercial value of the recording to the plaintiffs is reduced substantially to zero. The rationale is identical.

Defendants are less than accurate when they argue that protection for the plaintiffs under unfair competition will enable plaintiffs to exclude third persons from copying plaintiffs' works. The misappropriation doctrine, like the statute in *Goldstein,* would not prevent defendants from hiring artists to imitate or simulate plaintiffs' artists, and defendants could produce their own recordings to sound exactly or almost like those of the plaintiffs. *Goldstein,* at page 571. The stricture against misappropriation would not prevent this, because defendants would not be gaining the competitive advantage they do by pirating plaintiffs' recordings.

Nor, under *I. N. S.*, do plaintiffs lose their right to claim unfair competition by selling their recordings. *I. N. S.* ruled that publication was not an abandonment to the public, because it was a limited publication—a publication limited to the purpose of benefiting the readers, and not for the purpose of making merchandise of the news that would result in depriving A. P.'s members of their reasonable opportunity to obtain just returns. *I. N. S.,* at page 241. The court said abandonment was a matter of intent and it was not intended in that case. *I. N. S.,* at page 240. By selling their recordings to the public, plaintiffs surely did not intend to abandon them to defendants for piracy.

### Re-release as causing loss of state protection

Defendants also argue that, after Public Law 92–140 became effective on February 15, 1972, plaintiffs have re-released some of their pre-February 15, 1972, recordings, thus subjecting them to federal protection. Defendants argue that, by so submitting them, plaintiffs have lost their right to claim state law protection for the pre-1972 recordings, because the federal law must govern.

This argument, however, should not now be considered, because the case is before the court on demurrer. Defendants are raising a defense that calls for them to prove that those recordings were submitted for copyright protection under Public Law 92–140.

We note, however, that the re-release of a recording after February 15, 1972, probably does not secure copyright protection for that recording, because to give it protection would circumvent sec. 3 of Public Law 92–140, which provides that this law should not be "applied retroactively or be construed as affecting in any way any rights with respect to sound recordings fixed before" February 15, 1972. 85 U. S. Stats. at Large 392. We, however, do not decide this question.

### Judicial deference to legislative control of piracy

Defendants argue that copyright protection or anything providing similar protection should be controlled by the legislature, because it involves monopolies, the public good, and economic problems.

The trial judge noted that legislation was introduced in the Wisconsin Assembly on July 17, 1973, to protect recording companies from piracy. Since the trial court decision, the bill was killed at end of session without action.

We conclude that it is the duty of this court to act in circumstances where it is apparent that a wrong has been committed, and to furnish a remedy for that wrong when to do so is in accordance with previous statements of this court and would be fully consistent with the legislatively expressed policy of this state. Further explication of the duties of a common-law court are to be found in *Metropolitan Opera v. Wagner-Nichols Recorder Corp.* (1950), 199 Misc. 786, 101 N. Y. Supp. 2d 483; and Yankwich, *Unfair Competition as an Aid to Equity in Patent, Copyright and Trade-Mark Cases*, 32 Notre Dame Lawyer (1957), 438.

In *Metropolitan Opera*, at page 792, the court said:

"In passing upon the question of the sufficiency of a complaint alleging unfair competition it is helpful to bear in mind the origin and evolution of this branch of law. It originated in the conscience, justice and equity of common-law judges. It developed within the framework of a society dedicated to freest competition, to deal with business malpractices offensive to the ethics of that society. The theoretic basis is obscure, but the birth and growth of this branch of law is clear. It is an outstanding example of the law's capacity for growth in response to the ethical as well as the economic needs of society. As a result of this background the legal concept of unfair competition has evolved as a broad and flexible doctrine with a capacity for further growth to meet changing conditions."

Judge LEON R. YANKWICH wrote in the Notre Dame Lawyer, at pages 468 and 469:

"By using the concept of unfair practices, the courts have not sought to evolve absolute formulas. Rather, they have considered each case on its separate facts, and have sought to apply to specific situations flexible principles of equity aimed at fostering higher ethical business practices. Such treatment is desirable, for in a growing and expanding democratic order, changing trade conditions evolve situations that cannot always be anticipated.

"Therefore, attempts to formulate a unified theory may be as difficult in this field as in the field of science. Indeed, in science we deal with a physical universe which changes slowly, if at all. In law, we deal with social relations which are constantly changing. As the aim of law is to satisfy the continuing and expanding need for social control in a complex society, all jural principles must have within them possibilities of growth and development."

We believe this court, as one of final common-law appellate jurisdiction, has the affirmative duty to protect rights that have arisen in the course of the centuries of the evolution of the common law.

### Plaintiffs' request for an injunction

Plaintiffs have requested this court to issue an injunction restraining defendants from misappropriating plaintiffs' recordings to defendants' use and profit. Plaintiffs refer to sec. 268.02 (1), Stats. 1971,[6] for the authority to issue an injunction pending trial. In *Fromm & Sichel, Inc. v. Ray's Brookfield, Inc.* (1966), 33 Wis. 2d 98, 146 N. W. 2d 447, the trial court dismissed the complaint, holding there was no cause of action. On appeal, this court, after reversing, said it would grant an injunction in similar cases when the situation is appropriate. We said:

"Under usual circumstances, where the plaintiff has asked for an injunction and the trial court has deter-

---

[6] Sec. 268.02 (1), Stats., provides:

"**Temporary injunction; when granted.** (1) When it appears from his pleading that a party is entitled to judgment and any part thereof consists in restraining some act, the commission or continuance of which during the litigation would injure him, or when during the litigation it shall appear that a party is doing or threatens or is about to do, or is procuring or suffering some act to be done in violation of the rights of another party and tending to render the judgment ineffectual, a temporary injunction may be granted to restrain such act."

mined that his complaint states no cause of action, we would, upon reversing, if the facts made such action appropriate, direct the entry of an injunction, or if further fact-finding were necessary, we would refer the matter to the trial court to determine whether present conditions of fact permit or require the court to issue the requested injunction." (Pp. 102, 103)

The plaintiffs argue that an injunction is appropriate and necessary in this case. We have held that a temporary injunction is appropriate to prevent an irreparable harm to a business (*Lakeside Oil Co. v. Slutsky* (1959), 8 Wis. 2d 157, 98 N. W. 2d 415), and that the temporary injunction is appropriate to prohibit unfair competition (*Culligan, Inc. v. Rheaume* (1955), 269 Wis. 242, 68 N. W. 2d 810). As noted above, appellate courts in Illinois, Missouri, and South Carolina reversed lower court rulings and ordered the granting of injunctions in record piracy cases.[7] The appellate courts of California and North Carolina affirmed the lower courts' issuance of injunctions.

We conclude, however, that the matter of a temporary injunction in the instant case should be presented to the trial court. A substantial record on the injunction has already been made, and it may well be that no further hearing is required. The trial judge, in light of this opinion, is directed to reconsider the question of granting a temporary injunction.

We need not comment upon the order of the trial judge enjoining the plaintiffs from commencing similar suits elsewhere against these defendants. The order was moot upon the perfection of the appeal in this court. Its renewal would be inappropriate and unlikely.

*By the Court.*—Order sustaining demurrer reversed, and cause remanded with directions for further proceedings not inconsistent with this opinion.

---

[7] *See* pages 175, 176.