Henry Clay Greenberg, J.
Plaintiffs University of Notre Dame Du Lac (hereinafter referred to as “ Notre Dame” or “ the University”) and its president, Father Theodore M. Hesburgh, have invoked the equitable jurisdiction of this court to enjoin permanently the defendants Twentieth Century-Fox Film Corporation (hereinafter referred to as “ Twentieth Century-Fox ”), Twentieth Century-Fox Distributing Corporation, Doubleday & Company, Inc. (hereinafter referred to as “ Doubleday ”), Fawcett Publications, Inc. and Fawcett World Library (the last two defendants hereinafter referred to jointly as “ Fawcett ”):
(1) “ from distributing and releasing a motion picture entitled ‘ John Goldfarb, Please Come Home ’ and from advertising and promoting said motion picture by means of the paperback edition of the book of the same title, and published by defendant Fawcett by arrangement with defendant Doubleday, and ”
(2) “ from further publication, distribution and circulation of the novel ‘ John Goldfarb, Please Come Home ’ in either paperback or hard cover form ”.
At this time, precipitated by the imminent release of the motion picture for public showing — Christmas Day, 1964 — plaintiffs seek an injunction pendente lite and defendants cross-move for an order pursuant to CPLB 3211 (subd. [a], par. 7) *810 dismissing the complaint upon the ground that the pleading fails to state a cause of action on behalf of either plaintiff. Defendant Twentieth Century-Fox and its affiliates also cross-move for an order pursuant to CPLR 3211 (subd. [a], par. 10) dismissing the complaint upon the ground that Parker Organization, Inc. and Orchard Productions, Inc., both California corporations, persons who should be parties defendant to this action, have not been joined herein, and that this court should not proceed in their absence, and for an order pursuant to CPLR 603 severing the claims asserted against Twentieth Century-Fox and its affiliates from those asserted against the remaining defendants. Defendant Doubleday also cross-moves for an order pursuant to CPLR 3211 (subd. [a], par. 5) dismissing the complaint upon the ground that each of the causes of action is barred by the Statute of Limitations. Upon leave of the court, the Theatre Owners of America, Inc. was permitted, amicus curies, to argue and to submit an .affidavit in opposition to the plaintiffs’ motion.
Plaintiff University of Notre Dame is a private Catholic university of renowned high prestige and educational distinction, chartered in 1844 by a special act of the Indiana Legislature. As a private institution, the University is dependent for the great part of its financial support upon gifts by alumni, industrial corporations, trustees and the public and upon grants by private foundations and the United States. Judicial cognizance is. taken of the years of endeavor to build the University’s jealously guarded reputation and of the relationship between the bestowing of gifts and financial grants upon the University and its reputation.
The name and symbols of Notre Dame are also of immense commercial value to the University. Where appropriate, Notre Dame has licensed the use of its name and symbols for profit.
With respect to the motion picture industry, the history of the University reveals a consistent pattern of protection of the worth of its name and reputation on the part of Notre Dame and of respect for the property rights of the University on the part of members of the industry. . (This appears to be the practice of the industry and of institutions like Notre Dame, as evidenced by the affidavit of Lt. Col. William C. Bishop of the United States Military Academy, West Point, New York, with regard to the filming of “ The Long Q-ray Line ”.)
In 1931, Universal Pictures sought and was granted permission to use the University’s name; in 1939, Warner Brothers was licensed by the University to use the latter’s name.
*811 More recently, in 1955, Columbia Pictures Corporation and the University entered into a contract whereby the film company was granted an exclusive four-year option to avail itself of the University’s name and other specific property for the purpose of making a film. The contract provided for the approval of the University of the nature of the photoplay and other corollary factors. For its part, Columbia Pictures Corporation “ agreed to pay Notre Dame 1 all of the gross receipts * * * of the picture to be made hereunder in excess of twice the negative cost of the picture until such time as Notre Dame shall have received out of the gross receipts the sum of $250,000 ’ and thereafter, ‘ Notre Dame shall be entitled to receive twenty per cent (20%) of the gross receipts of the picture.’ ”
Guided by its anxiety over the possible injurious effect upon its reputation, the University, although destined to benefit financially from the arrangement, rejected, in May, 1962, Columbia Pictures Corporation’s request for authorization to permit references to Notre Dame and its team in the proposed motion picture entitled, 11 John Goldfarb, Please Come Home.”
Subsequent to this refusal by Notre Dame to authorize any references to its name, symbols or representatives, Columbia Pictures Corporation discarded any intentions to produce the motion picture. Thereafter Twentieth Century-Fox, with less business scruples and with utter disregard for the rights of another, in conjunction with Steve Parker, individually, Parker Organization, Inc., and another California corporation, filmed the subject motion picture. There is a dispute as to whether Mr. Steve Parker, the later partner of Twentieth Century-Fox in the production of the photoplay “ John Goldfarb, Please Come Home ”, was apprised of the University’s objections to the use of its name in connection with the screenplay. In any event, and in this court’s judgment, it is not overly important. Twentieth Century-Fox should have known, as a reasonable producer, that it could not infringe upon another’s property, without its consent.
Plaintiff Notre Dame, by its president, avers that the first knowledge it had of either the filming of the movie or the publication of a hard cover book by Doubleday, based on the same screenplay and bearing the same title, was obtained in June, 1964 (although, concededly, the latter was published on July 5, 1963). Immediately after it first became aware of the movie and of the book, the University notified Twentieth-iCentury Fox of its objections to the appropriation and use of its name in connection with the movie production. No particular action was then taken with respect to the book, the rationale being *812 that: “ While the book was actionable * * * it was apparent that by itself it would have no significant circulation and would not be of a consequence worth the bother of any action.”
Thereafter, an interim period of correspondence, telephone calls and conferences ensued, during all of which time the University was adamant in its objections. After several of its trustees had viewed the film at a “ sneak preview ” showing in New York, the University retained counsel to institute the necessary legal measures with regard to the picture, the hard cover book published by Doubleday, and a pocketbook edition, printed by Fawcett in November, 1964, the front and back covers of which picture the leading actress and actors and bear the legend “Now the comedy smash of the 20th Century (20th Century-Fox, of course) and starring Shirley MacLaine, Peter Ustinov and Bichard Crenna ”.
“ John Goldfarb, Please Come Home ” depicts the efforts of the Arab King of Fawzia who blackmails a captive Jewish American U-2 pilot and former All-American halfback into forming and coaching the Fawzian football team so that the team may challenge and defeat Notre Dame, and thus wreak vengeance for the refusal of Notre Dame to qualify the King’s son as a member of its football team. The leading female is a “ Strife ” magazine reporter who is assigned to write the story of the King’s harem and who “ joins ” the harem in order to get her story.
In an early scene, Ammud, the King’s son, wearing a green robe bearing the inscription “Go, Varsity ”, tells his father that he has failed to make the Notre Dame football team: “ Because I not Irish! They not want Arab! They Fighting Irish! Want whole team Irish! Want — !” Fawz, “ bellowing in a fury”, roars, “Irish! I-rish! Da Irish better dan Arab? Better dan Arab Prince W’ The King then says, “I fix dos lousy Irish! I fix dem, I fix dem, I fix dem! ”
The United States State Department becomes involved in the King’s plot, for the King informs the department that he will renew a lease on an air base established in his country upon the sole condition that the State Department arrange a game between the football teams of Fawz University and the University of Notre Dame.
Officials of the United States Government are then depicted as trying to influence the President of Notre Dame (specifically identified as “ the Reverend Father Theodore Hesburgh ” in the Doubleday book and in the Fawcett pocketbook, and though named “ Father Ryan ” in the movie, identifiable by means of *813 the aforesaid books as the same “ Father Hesburgh ”) to accept the challenge. After much pressure, Notre Dame does accept.
On the airplane that is taking the team to Fawzia, one player states: “ Ya think they play dirty? ” A second player responds: “ I guess. Coach said it would be an even match.”
The night preceding the game, the Notre Dame players attend an official State banquet at the “invitation” of the King. Although it constitutes a violation of their training program, the players .are warned that it would be an insult to the King to refuse his hospitality, his food and drink. The screenplay describes the scene in the Throne Room in the following manner:
“ The King sits on his throne. Below, the 1 Fighting Irish ’ are recumbent on pillows, feasting while glittering, sinuous belly dancers writhe and wiggle, Nubians fan the guests with' palm frond, and the men from South Bend eat wild Arab dishes ”.
“Another Angle — Two Notre Dame Players. They chew, staring at the belly dancers. Fourth N. D. Player You sure we should be watchin’ this? Fifth N. D. Player (a shrug) When in Rome . . . Fourth N. D. Player Whaddya think I’m talkin’ about? Fifth N. D. Player Shuddup an’ eat.”
The spiced mongoose which the wily King has provided and which the players are induced to eat has the calculated ill effects. Before and during the football game, the Notre Dame players are shown, gripped by nausea, racing from the playing field. Despite the foregoing and other tactics devised to assure the victory of Fawz University, the Notre Dame team, wearing-replicas of the green and gold uniforms of Notre Dame and helmets of Notre Dame decorated with painted green shamrocks, forges ahead.
One scene during the game shows the Notre Dame players’ reaction to a prayer call. As the Arab players bow to Mecca, one Notre Dame player says: “ I don’t like this. It’s spooky.” Another player retorts:11 Yeah. I’d rather play atheists. Then at least we got the edge,” to which a third says: “ What are they tryin’ t’ do? Turn this into a holy war? ”
At the crucial point of the game, the girl reporter, dressed in a Fawzian football uniform, gets possession of the ball and races through the Notre Dame team amid shouts of “It’s a broad! ” “A broad! ” An oil gusher which erupts from the middle of the field carries the heroine across the goal line to score the winning touchdown for Fawz University.
The foregoing illustrative examples, to which the court limits itself in order to avoid making this opinion inordinately long, demonstrate the context in which defendants have appended the *814 name Notre Dame and the symbols of the University to a concededly fictional team in what is described as a mythical farce. The script is ugly* vulgar and tawdry. Its justification is difficult to find even with a most liberal concept and with a most indulgent and elastic imagination.
The gravamen of the legal wrong allegedly perpetrated against Notre Dame consists of the unauthorized appropriation and commercial exploitation of that private institution’s name, and symbols and reputation, in a manner which inflicts irreparable injury upon the high prestige of the University and to the value of its name and symbols — all to the end that defendants might privately profit from such misappropriation and use. Wrongful acts of the same ilk form the basis for the president of Notre Dame, Father Hesburgh’s, contention, that the unauthorized use of his name for advertising and for trade purposes violates his rights of privacy pursuant to section 51 of the New York Civil Eights Law, and this statutory proscription and mandate serve as the prime basis for his personal cause of action against defendants.
Plaintiff Notre Dame thus postulates, as an indispensable element of its cause of action, a legally protected property right in its name, symbols and reputation with the attendant dominion and control over the exercise of that right.
‘ ‘ Political, social, and economic changes entail the recognition of new rights, and the common law, in its eternal youth, grows to meet the demands of society * * * [Thus] the term ‘ property ’ has grown to comprise every form of possession— intangible, as well as tangible.” (Warren and Brandéis, “ The Eight to Privacy ”, 4 Harv. L. Eev. 193 [1890].) That the legal concept of property comprehends an interest in one’s name, symbols, and all that they connote, can no longer be seriously disputed. (See, e.g., Cornell Univ. v. Messing Bakeries, 285 App. Div. 490 [3d Dept., 1955], affd. 309 N. Y. 722; Madison Sq. Garden Corp. v. Universal Pictures Co., 255 App. Div. 459 [1st Dept., 1938], mot. for lv. to app. or for rearg. den. 256 App. Div. 807; Trustees of Columbia Univ. v. Axenfeld, 136 Misc. 831 [Supreme Ct., N. Y. County, 1930]; for a comprehensive discussion, see Electrolux Corp. v. Val-Worth, Inc., 6 N Y 2d 556 [1959]; Gordon, “ Eight of Property in Name, Likeness, Personality and History”, 55 Northwestern U. L. Rev. 553 [I960].) “ A man’s name is his own property, and he has the same right to its use and enjoyment as he has to that of any other species of property.” (Brown Chem. Co. v. Meyer, 139 U. S. 540, 544 [1891].) The law affords the same status and protective aegis to the rights of an entity like Notre Dame. *815 “ [A]n educational institution which has won large public prestige by hard effort and at high cost ought not, against its will, have that prestige diluted by a commercial use of its name ”. (Cornell Univ. v. Messing Bakeries, 285 App. Div. 490, 492, supra; see, to the same effect, Roberts Mfg. Co. v. University of Notre Dame Du Lac, 152 F. Supp. 269 [N. D. Ind., 1957], affd. 258 F. 2d 256 [C. A. 7th, 1958].)
The property right so enunciated, however, is not an absolute one. ‘ ‘ A legal system attains its end by recognizing certain interests, — individual, public, and social, — by defining the limits within which these interests shall be recognized legally * * * and by endeavoring to secure the interests so recognized within the defined limits.” (Pound, “ Interests of Personality ”, 28 Harv. L. Rev. 343 [1915].)
The paramount interest which circumscribes and hence defines the scope of the property right in one’s name, symbols and reputation is embodied in the public’s “ Right to Know ” and vindicated by the constitutionally protected twins of freedom of speech and of the press. This court is acutely mindful that this competing public interest which thus limits the property right of Notre Dame is one to which our system of government is profoundly committed.
Judicial precedents, in harmonizing these conflicting rights, have rightly struck a balance in favor of permitting the dissemination of information about public figures and institutions with the concomitant unauthorized use of their names, symbols, portraits and the like. Insofar as these decisions restrict the prerogatives of property, the private right must yield to the public interest. In this context, the public’s “ Right to Know ”, as pragmatically secured by the First Amendment to the United States Constitution, attains a supreme ascendancy, and many of the usual attributes of the concept of property are placed in a subordinate position, and their exercise curtailed.
To the extent that the public has an interest in the dissemination of current events and informative and educational matter, the individual or institution is divested of the power to determine the use, i.e., the extent of exposure to or withdrawal from publicity, of its name and symbols; nor is the manner or form in which the legitimate public interest is vindicated by juridical significance. So long as the artist, writer, comedian, motion picture producer, etc., acts within the bounds of the permissible license afforded the public, there is no illegal trespass upon or taking of the property of the subject portrayed — and any financial benefit flowing therefrom is deemed irrelevant to the paramount issue.
*816 While the cases necessarily reveal an extraordinary liberality in defining the latitude of the public interest, there can be no doubt that the indispensable predicate for the judicially sanctioned use, without consent, of another’s name, symbols or other property is that such utilization of the property of another be confined within the scope of the public’s “ Bight to Know ”, A private individual or entity may, without permission, commercially capitalize upon the name or other property of another private individual or entity only insofar as the former serves as the instrument whereby the public’s “ Bight to Know ” is vindicated.
Where, however, the use exceeds the bounds of the legitimate public interest, and the marketing of another’s name, symbol or good will, in conjunction with the sale of one’s product, constitutes the sole evident purpose ancl effect of the appropriation, the law will enjoin such exploitation.
In a leading case enjoining the misappropriation, dilution and commercial exploitation by defendant Messing Bakeries of Cornell University’s name, symbols and prestige (Cornell Univ. v. Messing Bakeries, 285 App. Div. 490, 492 [3d Dept., 1955], affd. 309 N. Y. 722), the New York court stated:
“We have no difficulty in holding to be valid Cornell’s argument that it has a legal interest in preventing the exploitation of its name for business purposes. It is not necessary to jurisdiction or to relief that plaintiff be another business in the same line. * * * The ground of equitable intervention is not merely ‘ unfair competition ’ in the limited sense of protecting the solidly acquired rights of one business enterprise against another striving for the same market. Equity may also shield the thrust by business into the kind of legal rights acquired in areas entirely removed from commercial activities.
“ The theory underlying injunctive interference is that an educational institution which has won large public prestige by hard effort and at high cost ought not, against its will, have that prestige diluted by a commercial use of its name, suggesting connection or benefit to the institution from the enterprise.”
For the same reasons, the New York court, in Trustees of Columbia Univ. v. Axenfeld (136 Misc. 831) enjoined the use of Columbia University’s name by the “ Columbia Educational Institute ” upon the ground that the University “ has built up a great name and standing among the educational institutions of the country, which name cannot be appropriated by the device resorted to by the defendants.” (To the same effect, see Roberts Mfg. Co. v. University of Notre Dame Du Lac, 152 F. Supp. 269, 276 [N. D. Ind., 1957], affd. 258 F. 2d 256 [C. A. 7th, *817 1958] in'which the court stated that: ‘ ‘ The defendant, an educational institution with high public prestige and a chartered Indiana corporation by special Act of the Indiana Legislature and given a corporate name thereby, has a cognizable interest in and has the right of preventing others, from using its corporate name, or the significant part thereof, together with its official seal and symbols connected with the corporation, without its consent, on commercial products in such a manner that suggests connection with, benefit to, or authorization of by the defendant ”.)
Nor is it of significant distinction that the product here involved is manifested as speech, either oral or written. ‘ ‘ One undisciplined in the law may be forgiven if he reads the First Amendment in a literal vacuum * * * Yet it has been clear,
from the beginning of our history, that the Constitution does not provide for a wholly unfettered right of expression. Justice Holmes’s famous example of the man falsely shouting ‘ fire! ’ in a theatre, whom not even the most stringent protection of free speech would protect, is simply the most obvious example of speech which can be controlled.” (Schwartz, The Supreme Court [1957] 232.)
That the defendants utilized the medium of speech to effectuate the unconscionable commercial piracy of plaintiffs’ property must be deemed irrelevant. The means employed cannot change the nature of the legal wrong perpetrated; the medium of speech cannot, even by the most potent alchemy, transmute the legally interdicted into the judicially acceptable. (See International News Serv. v. Associated Press, 248 U. S. 215, 239 [1918], in which the Supreme Court enunciated the equitable doctrine prohibiting an entity from ‘ ‘ endeavoring to reap where it has not sown ”; Metropolitan Opera Assn. v. Wagner-Nichols Recorder Corp., 199 Misc. 786 [Supreme Ct., N. Y. County, 1950], affd. 279 App. Div. 632 [1st Dept., 1951]; Madison Sq. Garden Corp. v. Universal Pictures Co., supra; Blumenthal v. Picture Classics, 261 N. Y. 504 [1933]; Spahn v. Julian Messner, Inc., 43 Misc 2d 219 [Supreme Ct., N. Y. County, 1964].) Our system of law brands as odious the doctrine that the ends justify the means (see Brandeis, J., dissenting, in Olmstead v. United States, 277 U. S. 438, 471 [1928]; a fortiori must we reject the converse.
The case of Madison Sq. Garden Corp. v. Universal Pictures Co. (supra) is of especial significance to the matter now before this court. In that case plaintiff Madison Square Garden Corporation sought to enjoin the distribution of a work of fiction, a motion picture, ‘' Idol of the Crowds ’ ’, which purported to *818 “ show professional ice hockey games in New York city, including moving pictures of a professional ice hockey team, the ‘ Rangers, ’ controlled by plaintiff (255 App. Div. 459, 460.) Special Term had dismissed the complaint. The Appellate Division, in reversing the order of the lower court, stated (pp. 466-467):
“ Defendants * * * attempted to do by indirection what they could not do directly * * *
“ Their [the ‘ Rangers ’] presence in the picture, their reputation, plaintiff’s reputation and good will were utilized by defendants to induce the public to see the picture, all to the plaintiff’s loss and defendants’gain. * * *
“ A court of equity acts to promote honesty and fair dealing as well as to protect the purchasing public and the property rights of individuals. The evident purpose of these defendants in using pictures of plaintiff’s. team and referring in their publicity to the scene of their drama as Madison Square Garden in New York city was to appropriate the financial value such team and name had acquired through the plaintiff’s labor, expenditure and skill. ’ ’
With the example of such discerning judicial precedents to guide us, this court .should not be “ that ‘ blind ’ Court, against which Mr. Chief Justice Taft admonished in a famous passage * * * that does not see what ‘ [a]ll others can see and understand’”. (United States v. Rumely, 345 U. S. 41, 44 [1953].) Present-day market research, whose statistical pronouncements have virtually saturated the media of communications, has established beyond cavil the commercial value of a “known name ” to sell a product — whether the product be a loaf of bread, a book, a political candidate or a motion picture.
Whatever difficulty may be encountered in other cases in drawing a line of demarcation between the permissible and the forbidden, the defendants’ unconscionable conduct has far transgressed any justifiable bounds of legal license.
Defendant Twentieth Century-Fox admits that the subject story has no intrinsic connection with Notre Dame Du Lac. “It is inconceivable ”, the defendant asserts in an affidavit submitted in its behalf, “ that any present student or any prospective .student would even think that this ‘ Notre Dame ’ could in the wildest stretch of his imagination be the Notre Dame they know of through personal experience or reputation.” This position, that the motion picture does not depict the University of Notre Dame, permeates and pervades the proof proffered by this defendant.
*819 "Of critical significance, Steve Parker, the individual producer of the motion picture, categorically avers that: “It was never contemplated that anyone would be absurd enough to take this picture as anything but a complete farce from beginning to end, or to take any part of .it factually, o.r to construe this as any sort of actual reflection upon Notre Dame University.”
To further buttress this contention that the institution depicted is totally unrelated, aside from name and symbols, to the University of Notre Dame, the defendant unequivocally maintains that “ The plot is so patently preposterous that no one with the slightest sense of proportion could take any part of it seriously or .regard any of the incidents or characters involved as factual or designed to portray any actual event, individual or institution.”
Why then did defendants superimpose the name “Notre Dame ” and the symbols of the University upon the story and screen version! By their own urgings, and the court agrees upon a reading of the book and picture script, neither the book nor the motion picture is a satire, burlesque or any other form of literary portrayal or criticism of the University of Notre Dame or its .team; nor does it represent an educational, cultural, moral or sociological crusade in the public welfare. Thus, the name Notre Dame and the University’s symbols stand distinct and separate from the subject literary creations, and their use can in no way be classified as any form of art or literature, or a part thereof. It must be noted that in this connection it is of no relevance that the effect of the use might be deemed critical of, or even injurious -to, the reputation of the University of Notre Dame.
The critical factor is that the creation, “John Goldfarb, Please Come Home ’ ’, is in no way dependent upon or logically related to the subject of the University of Notre Dame. (Cf. Berlin v. E. C. Publications, 329 F. 2d 541 [C. A. 2d, 1964], cert. den. 85 S. Ct. 46.)
The glaringly evident purpose and effect of defendants’ “ tacking on ” of the name and symbols of Notre Dame were to capitalize on the commercial value such name and symbols had acquired in the minds of the consuming public.
This is a clear case of commercial piracy, and in no way is this decision intended to, nor does it restrict the legitimate conduct of the press or the expression of free -speech. This holding is strictly confined to judicial precedents which command the Chancellor to extend his arm to strike down the blatant marketing of another’s property. The determination reached here falls easily within the limits of the principles laid down *820 by the courts in successive decisions structured upon its capacity to grow in the light of the changing and developing conditions. If the boundaries or frontiers require further extension, this is precisely the kind of case that cries out for judicial quarantining. Legalistic legerdemain is not equal to the prophylaxis which the Chancellor may employ to excise the malignancy.
In accordance with the foregoing, defendants’ motion to dismiss the complaint upon the ground that the pleading fails to state a cause of action on behalf of either plaintiff is denied both as to the cause of action of plaintiff Father Hesburgh (see Binns v. Vitagraph Co., 210 N. Y. 51 [1913]; Sutton v. Hearst Corp., 277 App. Div. 155 [1st Dept., 1950]; Kelly v. Loew’s Inc., 76 F. Supp. 473, 485 [D. Mass., 1948]; see, also, concurring opinion of Steuer, J,, in Youssoupoff v. Columbia Broadcasting System, 19 A D 2d 865, 866 [1st Dept., 1963]) and as to the cause of action of plaintiff Notre Dame. Under the circumstances revealed, by all the papers now before us, defendant Twentieth Century-Fox’ request for a severance is denied, as are the remaining portions of its cross motion. The court sees no merit in the peripheral objections raised as to the failure to join in this action the two “ associates ” of defendant Twentieth Century-Fox (see Fox v. Western N. Y. Motor Lines, 257 N. Y. 305 [1931]; Siskind v. Levy, 13 A D 2d 538, 539 [2d Dept., 1961]; 2 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 1001.06) and as to the contention of laches (see Tiffany & Co. v. Tiffany Prods., 147 Misc. 679 [Supreme Ct., N. Y. County, 1932], affd. 237 App. Div. 801 [1st Dept., 1932], affd. 262 N. Y. 482 [1933]; Columbia Records v. Goody, 278 App. Div. 401, 407 [1st Dept., 1951]). Nor, under the circumstances of this case, is Doubleday’s position that this action for injunctive relief is time-barred with respect to defendant Doubleday.
Plaintiffs, on the other hand, have unequivocally demonstrated a clear right to the relief sought; to wit, an injunction pendente lite restraining the distribution and release of the motion picture entitled “ John Goldfarb, Please Come Home ” and the further publication, distribution and circulation of the novel “John Goldfarb, Please Come Home ” in either paperback or hard cover form, insofar as either the book or motion picture contains material, the use of which is proscribed by this determination.
Twentieth Century-Fox emphasizes that it has spent some $4,000,000 to produce “John Goldfarb, Please Come Home”. The answer to this is twofold. Firstly, the public’s interest in upholding the principles of the rights of property and of *821 privacy far outweigh any financial considerations. Secondly, Twentieth Century-Fox, as an organization of long standing in the motion picture industry, should have known that it could not appropriate another’s property, created as the result of years of sacrifice and endeavor.
The ‘ ‘ consideration of irreparable harm to the plaintiffs must necessarily outweigh the financial loss to defendants * * *. Such injury as may be inflicted on the defendants is the direct result of their unconscionable business practices and their invasion of the moral standards of the market place * * *. Cast in its proper environment, -we have here a business venture purposed to gather in the harvest the seeds of which were planted and nurtured by others at great expense and with consummate skill.” (Metropolitan Opera Assn. v. Wagner-Nichols Recorder Corp., 199 Misc. 786, 805.)
Accordingly, plaintiffs’ motion for an injunction pendente lite must be, and is, granted. An order may be settled, on short notice, consonant with all of the foregoing. Upon the settlement of the order, suggestions as to the amount of an undertaking shall be received. If the parties are in agreement, they may indicate in the order a provision for an immediate trial.