HIRSCH, Plaintiff-Appellant, v. S. C. JOHNSON & SON, INC., and others, Defendants-Respondents.

Supreme Court

*No. 76–620. Argued May 31, 1979.—Decided June 29, 1979.*
(Also reported in 280 N.W.2d 129.)

HEFFERNAN, J.   This appeal involves only questions of law, for the judgment was granted upon the defendants' motion at the close of the plaintiff's evidence to dismiss for failure to prove the existence of a cause of action upon which relief can be granted.

Elroy Hirsch, the plaintiff, seeks damages for the unauthorized use of his nickname, "Crazylegs," on a shaving gel manufactured by the defendant, S. C. Johnson & Son, Inc.  Johnson admitted in its answer that it knew that Hirsch is nicknamed "Crazylegs" and admitted that it marketed a product, a moisturizing shaving gel for women, under the name of "Crazylegs."  It acknowledged that it had not received Hirsch's consent for the use of this nickname but also alleged that the name, "Crazylegs," was not exclusively used with reference to the plaintiff; and it denied any misappropriation or damage to the defendant.  The case was tried for five days, and the motion to dismiss was brought at the close of the plaintiff's case.

Two legal issues surfaced as being controlling and were the subject matter of the motion to dismiss.  The first is whether a cause of action for appropriation of a person's name for commercial use exists as a matter of Wisconsin common law.  Johnson asserts that the cause of action for the appropriation of a person's name for

trade purposes is part and parcel of the law of privacy and makes the further undisputed contention that the right of privacy has never been accepted in Wisconsin as a matter of common law and on numerous occasions has been rejected. The second issue is whether the plaintiff established a prima facie case of common law trademark or trade name infringement when he failed to allege or prove that his name had ever been used to identify a product or service.

We conclude that the plaintiff's pleadings and proof were sufficient to state a cause of action upon which relief can be granted under both theories. A cause of action for the appropriation of a person's name for trade purposes is different in nature from other privacy torts, and prior decisions of this court are not controlling. The appropriation cause of action protects not merely the right to be let alone but, rather, protects primarily the property rights in the publicity value of aspects of a person's identity.

In respect to the second issue, we base our conclusion upon the rationale that the trial court failed to consider the common law of trade name infringement (as distinguished from trademark infringement) and that, under trade name law, there need be no evidence of the prior marketing of a product or service under the plaintiff's nickname, "Crazylegs." It is sufficient to allege and prove the cause of action to show that "Crazylegs" designated the plaintiff's vocation or occupation as a sports figure and that the use of the name on a shaving gel for women created a likelihood of confusion as to sponsorship. We therefore reverse and remand the cause for a new trial.

Assuming that the facts proved spelled out a cause of action cognizable by the common law of Wisconsin, the defendants did not dispute the plaintiff's assertion that

a prima facie case had been made entitling the plaintiff to go to the jury. The motion to dismiss at the close of the plaintiff's case is the equivalent of the common law demurrer to the evidence or a motion for involuntary nonsuit. The motion admitted the principal facts alleged but denied that those facts spell out any cause of action known to the common law. By so doing, the defendants have not waived their right upon retrial to dispute the evidence or to contend that the evidence is insufficient to sustain the cause of action. All that is before the court at this point is the equivalent of an involuntary nonsuit. The defendants acknowledge in their brief on this appeal that, "[T]his case is before this Court only on questions of law."

It is undisputed that Elroy Hirsch is a sports figure of national prominence. The testimony showed that Hirsch was an outstanding athlete at the Wausau (Wisconsin) High School, and thereafter he entered the University of Wisconsin in 1942. From the outset he proved to be a superstar of the era. In the fourth game of his first season of play at Wisconsin, he acquired the name, "Crazylegs." In that game, Hirsch ran 62 yards for a touchdown, wobbling down the sideline looking as though he might step out of bounds at any moment. Hirsch's unique running style, which looked something like a whirling eggbeater, drew the attention of a sportswriter for the Chicago Daily News who tagged Hirsch with the nickname, "Crazylegs." It is undisputed that the name stuck, and Hirsch has been known as "Crazylegs" ever since. We take judicial notice of the fact that as recently as June 24, 1979, he was referred to as "Crazylegs" in the Madison newspaper, the "Wisconsin State Journal."

After the United States entered World War II, Hirsch left the University of Wisconsin and was assigned to Marine Corps Officer Training at the University of Michigan. He there participated in football, basketball,

baseball, and track, and was the first person to earn four letters in one year at that school. His college and service athletic credits included 1942—All Big Ten, 1942 —All American, Wisconsin, 1943—All American, Michigan, 1945—All Service El Toro Marines, and 1946— Most Valuable Player of the College All Star Game. He thereafter starred with the Chicago Rockets and the Los Angeles Rams, both professional teams. He also played professional basketball with the Racine, Wisconsin, Knights in 1948. He played football with the Los Angeles Rams from 1949 until 1957. During this period his professional achievements included 1951—All Pro NFL, 1952—Pro Ball Squad, 1953—All Pro NFL, and in 1970 he was named on the All Time All Pro Team for the first fifty years of football. He received numerous other athletic awards, and as recently as 1977 he received the Hickok Golden Link Award, one of the few recipients in history, on the basis of his outstanding traits of character, as well as for his athletic performance.

During his career as an athlete Hirsch did a number of advertisements, in all of which he was identified as "Crazylegs." After his active playing days, he was a general manager of the Rams football team and assistant to the president of the Rams organization. In 1969 he became athletic director of the University of Wisconsin.

In addition to there being evidence of numerous commercials which used the name, "Crazylegs," there was evidence introduced to show that a movie was made in the 1950s of his life called, "Crazylegs All American." This movie is still being shown on television. Hirsch stated that he had been protective of his name and what type product it was connected with. He stated that he refused to do cigarette advertising and that he declined to do any advertising for liquor and that he had a beer commercial withdrawn after he became the athletic director at the University of Wisconsin. In each case his nickname, "Crazylegs," was used to identify him.

There was evidence to show that the usual minimum compensation for the use of an athlete's name on an unrelated product was five percent of gross sales. Two expert witnesses testified, and it is undisputed that these witnesses were experts in the business of representing celebrities in the endorsement of products or in licensing the use of athletes' names for advertising purposes.

On the motion to dismiss, the defendants argued, and the court concluded, that a cause of action does not exist in Wisconsin for the unauthorized use of a person's name for the purposes of trade, even assuming, for the purpose of the motion, the factual finding that Johnson was using Hirsch's name without consent. The court also concluded, consistent with the defendants' argument, that an essential element of the cause of action for a common law trademark infringement was the prior use of the name, "Crazylegs," to identify goods or services and that Hirsch had not produced such proof.

We consider these causes of action separately.

The defendants conceded that "Crazylegs" is the plaintiff's nickname and that Johnson marketed a product under that name. It is clear from the record that the plaintiff presented sufficient credible evidence upon which a jury could find, as a matter of fact, that the name, "Crazylegs," identified Hirsch and that the use of that name had a commercial value to Johnson. The question dispositive of this appeal, although not of the case on retrial, is whether as a matter of law a cause of action exists for the unauthorized commercial use of the name, "Crazylegs." Subsequent to the operative facts in this case, the Wisconsin legislature in 1977 enacted sec. 895.50, Stats., under the general caption of the "Right of privacy." One of the definitions of "invasion of privacy" is included in the provisions of sec. 895.50(2)(b):

"The use, for advertising purposes or for purposes of trade, of the name, portrait or picture of any living per-

son, without having first obtained the written consent of the person . . . ."

Under the law enacted by the legislature in 1977, Hirsch would now have a cause of action. This statute, however, was enacted after Johnson's "Crazylegs" product was taken off the market, and the question here presented is whether plaintiff had a cause of action under the common law. We conclude that he did.

The defendants' basic argument is that the right of privacy was never recognized by this court as a part of the common law. The defendants fortify this argument by pointing out that the statute enacted in 1977 denominates the unconsented use of a person's name for advertising purposes as an "invasion of *privacy*." (Emphasis supplied.) We conclude that the right of a person to be compensated for the use of his name for advertising purposes or purposes of trade is distinct from other privacy torts which protect primarily the mental interest in being let alone. The appropriation tort is different because it protects primarily the property interest in the publicity value of one's name. Because the previous decisions of this court declining to recognize a right of privacy have not dealt with the appropriation tort, they are not controlling. From almost the very outset of the recognition of the right of privacy, there has been an intermingling or confusion of the right of privacy and the right of control of the commercial aspects of one's identity.

The right of privacy was first extensively discussed in a law review article by Samuel D. Warren and Louis D. Brandeis in *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890). A reading of that article, which has been denominated as one of the most influential ever written, makes it clear that the authors were concerned not with the commercial exploitation of a celebrity's name, but were rather concerned with the right of a private in-

dividual to be left alone and not to have the private affairs of even public persons gossiped about in the press. It drew upon decisions based on principles of defamation and actions for breach of confidence.

The intermingling of the idea of the right of privacy and the right to control commercial exploitation of aspects of one's identity can be traced to one of the first cases to deal with the existence of a right of privacy. *Roberson v. Rochester Folding Box Co.,* 171 N.Y. 538, 64 N.E. 442 (1902). In *Roberson,* the New York Court of Appeals held that no right existed to protect a young woman from the unauthorized use of her portrait, captioned, "Flour of the Family," to promote the sale of flour. The decision provoked a storm of public disapproval, and the following year the New York legislature enacted a statute making it both a misdemeanor and a tort to use a name or a picture without consent for the purposes of trade. N.Y. Sess. Laws 1903, ch. 132, secs. 1 and 2. *See,* Prosser, *Privacy,* 48 Cal. L. Rev. 383, 385 (1960). During the next fifty years, the right of privacy was recognized by decision in most states and by statute in several others, so that by 1961, only three states, including Wisconsin, had not recognized the right. 1 Callmann, *Unfair Competition, Trademarks and Monopolies* (3d ed. 1967), sec. 3.3, pp. 57–60; Note, 1961 Wis. L. Rev. 332, 334.

The defendants argue that this court's rejection of the right of privacy in other factual contexts constitutes a rejection of a cause of action for appropriation of the plaintiff's name for Johnson's commercial advantage. But Dean Prosser in his article has explained that the right of privacy as it has evolved is "not one tort but four," which are "distinct and only loosely related." Privacy, *supra* at 389, 422. He also states:

"What has emerged from the decisions is no simple matter. It is not one tort, but a complex of four. The law of privacy comprises four distinct kinds of invasion

of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common . . . ." (at 389)

The four torts Prosser lists are:

"1. Intrusion upon the plaintiff's seclusion or solitude, or into his private affairs.

"2. Public disclosure of embarrassing private facts about the plaintiff.

"3. Publicity which places the plaintiff in a false light in the public eye.

"4. Appropriation, for the defendant's advantage, of the plaintiff's name or likeness." (at 389)

The fourth tort—the tort of appropriation alleged by Hirsch in the present case—Prosser points out is "quite a different matter" (at 406) from the other three, because the interest is not so much a mental one as a proprietary one in the exclusive use of one's name and likeness. This distinction between the first three causes of action listed by Prosser and a cause of action for the appropriation of one's name was also made by Endejan, in *The Tort of Misappropriation of Name or Likeness Under Wisconsin's New Privacy Law*, 1978 Wisconsin Law Review 1029. Therein, in discussing the tort of appropriation, the author stated:

"The interest to be protected here deals primarily with the individual's 'right of publicity' and not the right to be let alone in the classical sense of privacy. This concept of appropriation sought to prevent the use of a celebrity's personality without consent. Thus, the tort represents the protection of a property interest." (at 1030)

The term, "right of publicity," was apparently first used by Judge Jerome N. Frank in *Haelan Laboratories, Inc. v. Topp's Chewing Gum, Inc.*, 202 F.2d 866 (2d Cir. 1953). Judge Frank wrote:

"[I]t is common knowledge that many prominent persons (especially actors and ball-players), far from hav-

ing their feelings bruised through public exposure of their likenesses, would feel sorely deprived if they no longer received money for authorizing advertisements, popularizing their countenances, displayed in newspapers, magazines, busses, trains and subways. This right of publicity would usually yield them no money unless it could be made the subject of an exclusive grant which barred any other advertiser from using their pictures." (at 868)

Building upon the rationale of *Haelan,* Melville B. Nimmer wrote in *The Right of Publicity,* 19 Law and Contemporary Problems 203 (1954) :

"Well known personalities connected with these industries do not seek the 'solitude and privacy' which Brandeis and Warren sought to protect. Indeed, privacy is the one thing they do 'not want, or need.' Their concern is rather with publicity, which may be regarded as the reverse side of the coin of privacy. However, although the well known personality does not wish to hide his light under a bushel of privacy, neither does he wish to have his name, photograph, and likeness reproduced and publicized without his consent or without remuneration to him. With the tremendous strides in communications, advertising, and entertainment techinques, the public personality has found that the use of his name, photograph, and likeness has taken on a pecuniary value undreamed of at the turn of the century. [Footnotes omitted.]" (at 203–04)

Hence, Prosser, Frank, and Nimmer stress the significant distinction between the tort of appropriation and other torts involving invasion of privacy. The tort of appropriation protects a property right, not only the right of a person to be let alone or to live his life in seclusion without mention in the media. The incongruity of lumping a cause of action for appropriation or violation of the right of publicity with the other privacy torts is eloquently stated in the article by Treece, *Commercial Exploitation of Names, Likenesses, and Personal Histories,* 51 Tex. L. Rev. 637 (1973). Treece stated:

"An advertiser who appropriates an individual's personality either to attract attention to an advertisement or a product, to imply endorsement of a product or service, or to appeal to consumers' desires to associate with the individual depicted realizes an advertising benefit primarily because of the public image of the personality he has appropriated. The advertiser uses the audience appeal of the personality he has appropriated to sell goods. Audience appeal is a principal stock-in-trade of a celebrity. The celebrity creates audience appeal not only through the substantive achievements that bring him fame, but at the expense of the privacy that he must surrender in becoming a public personality. It would be ironic for a court to refuse to protect a celebrity's economic interest on the grounds that he had surrendered any interest in privacy.

"Since the primary advertising value of a celebrity's personality was created through the work and sacrifice of the celebrity, that value could constitute an interest that the law should protect." (at 646–47)

Because the right of publicity—the right to control the commercial exploitation of aspects of a person's identity—differs from other privacy rights, it is appropriate for this court to recognize a cause of action to protect this right, although other privacy rights were rejected in prior decisions of this court. Protection of the publicity value of one's name is supported by public-policy considerations, such the interest in controlling the effect on one's reputation of commercial uses of one's personality and the prevention of unjust enrichment of those who appropriate the publicity value of another's identity. *See*, Treece, *supra* at 637. Moreover, where, as here, the record attempts to demonstrate that Hirsch over a period of years assiduously cultivated a reputation not only for skill as an athlete, but as an exemplary person whose identity was associated with sportsmanship and high qualities of character, and where the record demonstrates that much time and effort was devoted to that purpose, the rationale of *Mercury Record*

*Productions, Inc. v. Economic Consultants, Inc.,* 64 Wis.
2d 163, 218 N.W.2d 705 (1974), is appropriate. It is a
form of commercial immorality to "reap where another
has sown." (at 176)

Despite the fact that it appears clearly appropriate
that this court recognize a common law action to pro-
tect against the unconsented commercial appropriation
of one's identity, we may be foreclosed from doing that
if prior decisions of this court have expressly rejected
that cause of action. We have examined all of the cases
referred to us by the parties and conclude that this
court has never before addressed the question of whether
an individual has a cause of action for the appropria-
tion by another of his identity for commercial purposes.

The first privacy case to come before the Wisconsin
Supreme Court was *Klug v. Sheriffs,* 129 Wis. 468, 109
N.W. 656 (1906). Therein, a widower refused to pay for
an unauthorized portrait of a deceased wife. He was
sued by the artist upon a contract claim. The widower
defended on the ground that the painting of the portrait
was "an invasion of the so-called 'right of privacy.'"
(at 470) The trial court discussed the law of privacy as
it existed in other jurisdictions in 1906 and quoted with
apparent approval the dissent of Mr. Justice Gray of
the New York Court of Appeals in *Roberson v. Rochester
Folding Box Co., supra.* In that dissent, Mr. Justice
Gray stated that the right of privacy may in some in-
stances involve the protection of a property right. The
Wisconsin court in *Klug, supra,* after a discussion of the
right of privacy, stated:

> "It will be seen, however, upon examination of the
> cases cited as sustaining the so-called right of privacy,
> that many of them turn upon property rights or breach
> of trust, contract, or confidence. . . .
> "We think the case before us does not turn upon the
> so-called 'right of privacy,' but upon contract relations."
> (at 472)

The *Klug* case is significant in that it recognized from the very outset of Wisconsin's jurisprudence on the right of privacy that rights claimed under that rubric might partake of other recognized causes of action. The mere fact that the right of privacy was asserted but not recognized did not defeat the plaintiff's cause of action on alternate grounds revealed by the pleadings and proof. The widower won his case on the contract defense.

Wisconsin first directly addressed the question of the existence of a right of privacy in the peculiar factual and procedural context of *Prest v. Stein,* 220 Wis. 354, 265 N.W. 85 (1936). In *Prest,* the plaintiffs brought an action to enjoin the defendant from selling "Franklin D. Roosevelt" cigars on the ground that the use of the President's name constituted an unfair trade practice. In the trial court, the plaintiff's motion for a temporary injunction was granted, but at trial the court found that the plaintiff had no legal right to use the President's name for advertising purposes and for that reason could not recover. It was held, therefore, that the defendant's use of the President's name was not unlawful and the temporary injunction was dissolved. Thereafter, the defendant moved for a rehearing, claiming that he was entitled to damages as the result of the temporary injunction. The trial court found that the defendant had violated the injunction and sustained no damages. The trial court in effect found that neither party had the right to use the President's name and portrait and, because the defendant had no such right, he was deprived of no legal right when he was enjoined from using the President's name and portrait. The defendant appealed from the judgment that denied him damages. This court on review concluded that the trial court was in error, because "[a]t common law the use of the name and photograph of another for advertising purposes was not unlawful." (at 357) It is clear that this court concluded

that neither the plaintiff nor the defendant had a property right in using the name or portrait of the President. The case, therefore, rested upon the holding that the defendant was wrongfully enjoined because the plaintiff had no protectible right which could be enforced. It is almost irrelevant dicta in these circumstances to state that "at common law the use of the name and photograph of another for advertising purposes was not unlawful."

The Wisconsin court in *Prest* relied for its statement on the case of *Henry v. Cherry & Webb*, 30 R.I. 13, 73 A. 97 (1909). An examination of that case demonstrates that the above quotation should not be given the broad scope which the defendant in the present case would attribute to it. The basis of *Henry v. Cherry & Webb* was that, in the view of the Rhode Island court, the right of privacy was entirely different than the right asserted to protect a property interest. The court in *Henry* stated that the essence of a common law action for invasion of privacy is a situation where the only injury alleged is that of mental suffering. It amplified on that conclusion by stating:

". . . as we understand the question, the right of privacy . . . contemplates a simple right, uncomplicated with and uninfluenced by other rights; as, for example, the right to . . . property . . . ." (at 19)

The Rhode Island court pointed out that the right to privacy is a personal right growing out of the inviolability of the person and is unrelated to a property right. It went on to say that:

"The gravamen of the offense in violation of the right of privacy is the interference with the seclusion of the individual, and not the publication." (at 25)

An analysis of the *Henry* case makes it clear that its rationale is not appropriate where a property right is

sought to be protected; and *Henry* itself does not disagree with those cases which afforded protection to property rights, even though they were brought under the general classification of the right of privacy. *Henry* recognized that the causes of action for the protection of the right of privacy stand on a different basis than a cause of action which protects the property rights of an individual appropriated by another without consent. Accordingly, *Prest* does not stand for the proposition that one may not bring an action for the appropriation of one's name or identity when that person has property rights represented by that name and identity. In *Prest,* the plaintiff had no property rights in the name he sought to protect, and the authority underpinning the dicta in *Prest*—the *Henry* case—expressly recognized that a case involving a property right was to be treated differently. While the statement in *Prest* had some validity in the factual context of that case, it cannot be expanded to cover facts not at issue or situations not contemplated in the case. It does not hold that the common law of Wisconsin prohibits the bringing of a cause of action to protect the property rights in one's identity or name from commercial exploitation by others.

The case of *Judevine v. Benzies-Montanye Fuel & Warehouse Co.,* 222 Wis. 512, 269 N.W. 295 (1936), arose out of an action in which a plaintiff claimed that his privacy was invaded when the defendant listed his name in a handbill advertising the sale of delinquent accounts. The court concluded that no cause of action lay for the invasion of the right of privacy. However, the precedent is irrelevant to this case, for the type of invasion involved in *Judevine* was not appropriation, but the public disclosure of embarrassing private facts. *Judevine* stands as authority for the proposition that the right of privacy based on the mental interest in privacy would not be recognized by the common law of Wisconsin. It does

not, however, control the question of the appropriation of a person's name or identity for commercial purposes.

The same can be said for *State ex rel. Distenfeld v. Neelen*, 255 Wis. 214, 38 N.W.2d 703 (1949), and *Yoeckel v. Samonig*, 272 Wis. 430, 75 N.W.2d 925 (1956). Again, these cases merely demonstrate this court's refusal to recognize a privacy cause of action for an intrusion exclusively into one's peace of mind and incorporate the expression of this court that, if the right is to be created, it should be done by the legislature. These cases do not stand for the proposition that the tort of appropriation of a person's name or identity—the right of publicity—should not be recognized by the common law.

We need not in this case comment at length upon the decision or rationale of *Yoeckel v. Samonig, supra.* Therein, the facts show that the defendant, the operator of a tavern, entered the ladies' restroom while the plaintiff, Norma Yoeckel, was using the facilities and took her photograph with a flash camera. The refusal to recognize this invasion of Norma Yoeckel's right to privacy has been called "an atrocity" by Dean Prosser, *supra* at 48 Cal. L. Rev. 388, n. 58. We need not correct whatever error the court may have made in that case, for that fact situation is now made actionable by the right of privacy statute enacted by the legislature in 1977. *See,* sec. 895.50(2)(a), Stats.

In addition, the invasion of Norma Yoeckel's interests today might well be actionable as conduct which intentionally inflicts emotional distress. *Slawek v. Stroh*, 62 Wis.2d 295, 215 N.W.2d 9 (1974); *Alsteen v. Gehl*, 21 Wis.2d 349, 124 N.W.2d 312 (1963).

Another case relied upon by the defendants is *Meier v. Meurer*, 8 Wis.2d 24, 98 N.W.2d 411 (1959). That case indeed stands for the proposition that an action for the invasion of privacy did not exist at common

law, but *Meier,* like the other cases decided by this court and discussed in this opinion, did not address the question of whether a person having a property right in his name or identity, which has been appropriated without consent by another for purposes of trade, has a cause of action.

The review of these cases demonstrates that the right of a person to control the commercial exploitation of the property right in the use of that person's name is not controlled by cases involving the right of privacy but no property interest. Rather, the asserted cause of action is dependent upon the cases that recognize the "right of publicity" and the limitations that the possessor of that property right may place upon the commercial and public use of the name.

■

The record is replete with evidence from which a jury could conclude that Elroy Hirsch's name indeed had commercial value. There was testimony that he had been paid for the use of the name in the past, and there was expert testimony by qualified persons who stated the reasonable compensation for the authorized use of his name or identity. That the tort is compensable is clear. As the commentator in *The Tort of Missappropriation of Name or Likeness Under Wisconsin's New Privacy Law,* 1978 Wis. L. Rev. 1029, 1046, *supra,* stated:

"The rule is fairly well established that well known athletes have a property right in their identities and are allowed to recover for wrongful appropriation."

■

The fact that the name, "Crazylegs," used by Johnson, was a nickname rather than Hirsch's actual name does not preclude a cause of action. All that is required is that the name clearly identify the wronged person. In the instant case, it is not disputed at this juncture of

the case that the nickname identified the plaintiff Hirsch. It is argued that there were others who were known by the same name. This, however, does not vitiate the existence of a cause of action. It may, however, if sufficient proof were adduced, affect the quantum of damages should the jury impose liability or it might preclude liability altogether. Prosser points out "that a stage or other fictitious name can be so identified with the plaintiff that he is entitled to protection against its use." 49 Cal. L. Rev., *supra* at 404. He writes that it would absurd to say that Samuel L. Clemens would have a cause of action if that name had been used in advertising, but he would not have one for the use of "Mark Twain." If a fictitious name is used in a context which tends to indicate that the name is that of the plaintiff, the factual case for identity is strengthened. Prosser, *supra* at 403.

The record shows that Johnson's first promotion of the product, "Crazylegs," was the sponsoring of a running event for women and the use of a television commercial similar to the "Crazylegs" cheer initiated at University of Wisconsin football games when Elroy Hirsch became athletic director. These facts may augment and further identify the sports context in which the name, "Crazylegs," has been particularly prominent. The question whether "Crazylegs" identifies Elroy Hirsch, however, is one of fact to be determined by the jury on remand, and full inquiry into that fact is not foreclosed by the defendants' concessions in the present procedural posture of the case.

Accordingly, we hold that a cause of action for appropriation of a person's name for trade purposes exists at common law in Wisconsin. The facts adduced in the plaintiff's case prima facie were sufficient for submission to the jury. The trial court erred when it concluded as a matter of law that Wisconsin cases which held that

the right of privacy did not exist at common law in Wisconsin foreclosed the plaintiff from asserting a cause of action for the commercial misappropriation of his name and identity.

Additionally, Hirsch argued that the facts adduced established a prima facie case of common law trade name infringement. The trial court also ruled on this question as a matter of law. It concluded that the case did not involve trademarks or trade names because there was no evidence showing Elroy Hirsch's name or the name, "Crazylegs," had ever been connected with a service or a product. The position of the trial court and the position urged by the defendant on this appeal is that no cause of action for trade name infringement will lie unless it is alleged and proved that the alleged trade name, "Crazylegs," was used by the plaintiff to identify goods or services and distinguish them from others. We conclude that this is an erroneous view of the law.

The misuse of a trade name is a portion of the law of unfair competition. We stated in *J. I. Case Plow Works v. J. I. Case Threshing Machine Co.*, 162 Wis. 185, 155 N.W. 128 (1916), that the law of unfair competition is based on the maxim that, "One man may not reap where another has sown nor gather where another has strewn." (at 201) Common law trademark and trade name infringement is a branch of the law of unfair competition, and the principles used in each are substantially similar. *First Wisconsin National Bank of Milwaukee v. Wichman*, 85 Wis.2d 54, 60, 270 N.W.2d 168 (1978). "Passing off," or misrepresenting one's goods or services as those of another, and direct competition are no longer considered to be essential elements of a cause of action for unfair competition. *Mercury Records, supra* at 173 *ff.; First Wisconsin National Bank*

of *Milwaukee, supra* at 66; 1 Callmann, *Unfair Competition, Trademarks and Monopolies* (3d ed. 1967), sec. 5.1, p. 142 *ff*. The modern approach to the law of unfair competition holds that:

"Property rights of commercial value are to be and will be protected from any form of unfair invasion or infringement or from any form of commercial immorality . . . ." *Metropolitan Opera Ass'n, Inc. v. Wagner-Nichols Recorder Corp.*, 101 N.Y.S.2d 483, 492 (S. Ct. 1950); *see, also, Hogan v. A. S. Barnes & Co., Inc.*, 114 U.S.P.Q. 314, 316–19 (Pa. C.P., Philadelphia County, 1957).

As the discussion herein has demonstrated, the publicity value of a celebrity's name is built up by the investment of work, time, and money by the celebrity. The economic damage caused by unauthorized commercial use of a name may take many forms, including damage to reputation if the advertised product or service is shoddy and the dilution of the value of the name in authorized advertising. It was particularly the latter aspect of advertising with which the court concerned itself in *Hogan, supra.* See, also *Treece, supra,* 51 Tex. L. Rev. at 642.

The court reached its conclusion that Hirsch proved no cause of action for common law trademark infringement because he proved only that the name, "Crazylegs," was used to identify himself and not to identify goods or services. In that conclusion the court was correct in stating that there was no proof that the name was used to identify goods or services.

The definition of "trademark" which was adopted by this court in *First Wisconsin, supra,* requires use in connection with goods and services. Such use, however, is not required where a name meets the definition of a trade name. The trial court failed to consider whether Hirsch's use of the name, "Crazylegs," met the definition of a

trade name. Restatement 2d, *Torts,* sec. 716 (Tent. Draft No. 8, 1963), adopted as the common law of Wisconsin in *First Wisconsin, supra,* defined a trade name:

"A trade name is a designation which is used by a person to identify his business, vocation, or occupation, provided such use is not prohibited by legislative enactment or by an otherwise defined public policy."

Sec. 717 of the Restatement provided that one infringes a trademark or trade name if:

". . . without a privilege to do so, he uses on or in connection with his goods, services or business a designation which so resembles the other's previously used mark or trade name as to be likely to

"(a)  cause confusion, mistake or deception, or
"(b)  cause prospective purchasers to believe that

> "(i)  the actor's goods or services are those of the other, or
> "(ii)  the actor's goods or services emanate from the same source as the other's goods or services, or
> "(iii)  the actor's goods or services are approved or sponsored by the other, or
> "(iv)  the actor's business is the business of, or is in some manner associated or connected with, the other,

even though the actor does not use the designation with a purpose to deceive."

There was ample evidence for a jury to believe that "Crazylegs" designated Hirsch's vocation or occupation as a sports figure, first as a player and later in management and administration. There was also ample evidence to show the likelihood of confusion as to sponsorship of the product as the result of Johnson's use of the name, "Crazylegs."

■

Hirsch testified that there was actual confusion and that people told him that they assumed that he was

sponsoring the product, and in fact he received orders for the product. For Hirsch to show that there was an infringement on the trade name, "Crazylegs," there was no necessity as a matter of law that the name had previously been identified with products and services. It was sufficient to show that the name was one used to identify Hirsch in this business or occupation and that the use of the name caused confusion or mistake in respect to the approval or sponsorship of the goods. The court erred in dismissing the cause of action for trade name infringement.

Various evidentiary problems have also been raised on this appeal by Hirsch. We agree with the position of the defendants on this appeal that only the questions of law heretofore discussed are before the court, and, accordingly, only those matters can be decided. These evidentiary problems may not, and probably will not, on retrial be presented to the court in the identical form posed in the first trial. We point out, however, that the objection to the introduction of evidence of the prior licensing by Hirsch of a restaurant bearing the name, "Crazylegs," on the grounds that it was not mentioned in pretrial depositions and therefore constituted surprise, could hardly be appropriate on a retrial, because a full offer of proof has been made.

In addition, the plaintiff claims it was error for the trial court to refuse to permit a showing of the movie, "Crazylegs All American," to the jury. It is clear that the showing of that picture was highly relevant to the issues in the case. It therefore was admissible. The trial judge, however, excluded the full showing of the movie on the ground that it would be cumulative and prejudicial. We doubt that prejudice would result from the showing of the movie, but whether or not it was excluded from evidence because it was cumulative and time consuming was within the trial court's discretion.

If the movie is again offered in evidence, the trial court will again be required to address itself to that point.

We conclude that Elroy Hirsch made out a prima facie case under two separate theories: The appropriation of his name for purposes of trade, and infringement of a trade name under the common law. Nevertheless, substantial problems of proof stand in the way of the plaintiff's eventual success in this lawsuit. As a result of the motion of the defendants in the nature of a demurrer to the evidence, crucial facts which must be proved are conceded but only for the purpose of this appeal. Upon retrial under the appropriation theory, Hirsch must prove that the name, "Crazylegs," identifies him and that he has suffered damages based either on his loss or Johnson's unjust enrichment. Under the common law trade name-infringement theory, he must prove that "Crazylegs" designates his vocation or occupation and that there is a likelihood of confusion tending to make the public believe that he sponsored the Johnson product. These are questions which must be determined by the jury. Because the plaintiff's complaint was dismissed prior to a jury determination of the factual issues, the cause must be remanded for a new trial.

*By the Court.*—Judgment reversed and cause remanded for a new trial consistent with directions herein.

DAY, J. *(dissenting).* I dissent. Up until the enactment of sec. 895.50, Stats. (1977), this Court has consistently refused to recognize a right of action in Wisconsin based on a common law right of privacy.

In *Yoeckel v. Samonig,* 272 Wis. 430, 434–435, 75 N.W.2d 925 (1956), this court declined to recognize a right of privacy and cited with approval the holding of *Brunson v. Ranks Army Store,* 161 Neb. 519, 73 N.W.2d 803, 806 (1955). The Nebraska court said:

"Our research develops no Nebraska case holding that this court has in any form or manner adopted the doctrine of the right of privacy, and there is no precedent in this state establishing the doctrine. Nor has the legislature of this state conferred such a right of action by statute. We submit that if such a right is deemed necessary or desirable, such right should be provided for by action of our legislature and not by judicial legislation on the part of our courts. This is especially true in view of the nature of the right under discussion, under which right not even the truth of the allegations is a defense."

To avoid the effect of *Yoeckel*, Mr. Hirsch has characterized his cause of action as one based on the tort of appropriation of a person's name for commercial purposes, rather than the right of privacy. However, the "right of publicity" is but one facet of the right of privacy doctrine; both ideas are rooted in the theory that the individual has a right to control the use of his own name. In the absence of legislation, this court has refused to recognize such a right.

Concededly, the Wisconsin cases have not squarely dealt with the tort of appropriation of an individual's name or likeness. However, language in *Meier v. Meurer*, 8 Wis.2d 24, 98 N.W.2d 411 (1959), suggests that this court has conceptualized the rights of privacy and publicity as twin doctrines. *Meier* involved an action for libel, in which the plaintiffs brought an action to recover for the commercial use of their name in a sale by the defendants of assets formerly owned by the plaintiffs. The plaintiffs alleged that a valuable property right consisting of the name "Meier Bakery" had been irreparably damaged. This court reversed an order overruling a demurrer, stating:

"Plaintiffs allege that defendants had no authority to use the Meier name. Unauthorized public use of another's name does not give rise to a cause of action for

libel, and in several cases this court has decided that a cause of action for invasion of a right of privacy does not exist in this state. *Judevine v. Benzies-Montanye Fuel & Whse. Co., supra; Yoeckel v. Samonig,* 272 Wis. 430, 75 N.W.2d 925 (1956)."

What was implicit in *Meier* was explicit in *Carson v. National Bank Of Commerce Trust & Savings,* 501 F.2d 1082 (8th Cir. 1974). In that case a well known entertainer sought damages for a travel agency's unauthorized use of his name and picture to promote a tour known as "Nebraskan's Johnny Carson Tour of Las Vegas." Applying Nebraska law, the 8th Circuit held that there was no right to control the use of one's own name and image, whether characterized as an action for "misappropriation," or invasion of privacy. Relying on the same *Brunson* case cited in *Yoeckel,* the court said:

"Brunson, argues plaintiff here, sought damages not for his loss of the opportunity to sell his name for commercial purposes, but for the mental suffering he underwent as a result of the revelation of an embarrassing incident, whereas Carson (mindful perhaps of the Brunson case) has carefully refrained from mentioning 'privacy' in his complaint and has argued that he seeks damages for the misappropriation of a 'valuable property right.' Nonetheless, the Court believes that whether the right for which plaintiff seeks protection is denominated his right to privacy or his 'right to publicity,' as plaintiff has characterized his first cause of action, it stems from Court recognition that an individual has the right to control the use of his own name and image and the publication of information about himself. If that right is conceded, several distinct causes of action may arise from it, depending upon the particular conditions; if one's pursuit of his own private activities is interfered with (the tort of 'intrusion') ; if intimate details of one's personal life are made public; if publicity places one in a false light in the public eye; and, finally, if commercial use is made of one's name and image without consent. Prosser, Privacy, 48 Cal. L. Rev. 383, 389

(1960). All these actions stem from the initial recognition of a right to control the use of one's own name and image, which the Nebraska Supreme Court explicitly rejected in *Brunson.* Plaintiff's characterization of his action as one seeking damages for 'misappropriation' cannot serve as a means to escape the rule of the *Brunson* case." *Id.* at 1084–85.

To similar effect is *Maritote v. Desilu Productions, Inc.,* 230 F. Supp. 721 (W.D. Ill. 1964), aff'd 345 F.2d 418 (7th Cir. 1965). In *Maritote,* the administratrix of the estate of Al Capone sued Desilu Productions, Columbia Broadcasting System, Inc., and Westinghouse Electric Corporation, asserting that the defendants had been unjustly enriched through an alleged appropriation of the name, likeness and personality of Al Capone for use in television broadcasts of "The Untouchables."

Under Illinois law, the right of privacy did not survive the death of the individual, and as a result, the lawsuit was characterized as an appropriation of the deceased's property right in his own name. The court commented, however:

"Plaintiffs have attempted to evade the personal nature of an invasion of privacy suit, by attaching to it a new label, that of appropriation of a property right. Yet, despite the label, such an action remains one for invasion of privacy, under Illinois law, and must be subject to the restrictions imposed thereon.

" . . .

"The right sought to be asserted here falls squarely within the right of privacy concepts." *Id.* at 723.

In view of the fact that the legislature has now acted in this area, under principles of *stare decisis,* I would hold that Mr. Hirsch is foreclosed by *Yoeckel v. Samonig* from maintaining this action.

I would also hold that two simple words like "crazy" and "legs" whether spelled separately or as one word cannot as a matter of law under the facts here be re-

garded as the commercial "trade name" property of Mr. Hirsch. The record shows that other athletes have been so designated. If the name Elroy or Hirsch had been used with crazy and legs, a different case would present itself because it would show that Elroy Hirsch was the person whose name was being used for commercial purposes. A gel for the shaving of women's legs has no association with football or any of the other athletic activities of Mr. Hirsch. Here again a closer case might be presented if the subject of advertising was football helmets or football shoes but hardly women's leg shaving cream.

One can recall "Crazy" Guggenheim on television a few years ago or the famous "Legs" Diamond. It would be reaching beyond reason to say either had a monopoly on the words "crazy" or "legs." This writer finds it hard to see how combining the two words in this context gives Mr. Hirsch a proprietary interest in the words.

Counsel for Mr. Hirsch referred to an athlete called "Bulldog" Turner, but one could hardly claim the word "Bulldog" has become one person's property. There have been athletes known as "the horse," others known as "dizzy" and "daffy" but any of those names attached to a shaving cream for women's legs should not give rise to a cause of action for commercial exploitation of one's "name."

I would affirm. I am authorized to state that Mr. Justice CONNOR T. HANSEN joins in this dissent.