In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3954

IN THE MATTER OF:

STEFANIE KIM KUEHN,

*Debtor-Appellee.*

APPEAL OF:

CARDINAL STRITCH UNIVERSITY, INC.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 07-cv-00368-bbc—**Barbara B. Crabb**, *Chief Judge.*

ARGUED MAY 28, 2008—DECIDED APRIL 16, 2009

Before EASTERBROOK, *Chief Judge*, and RIPPLE and WOOD, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. This case presents a single question: Does a university violate the Bankruptcy Code's automatic stay or discharge injunction by refusing to provide a transcript because pre-petition debt remains unpaid?

Stefanie Kim Kuehn, an art teacher, enrolled in a two-year master's degree program at Cardinal Stritch

University. She took advantage of the University's pay-as-you-go plan but stopped paying midway through the first year. The University nonetheless allowed her to take exams, receive grades, and sign up for new classes. She completed all of the work required for a master's degree, which the University awarded. But when Kuehn asked for a transcript—the proof necessary to receive an increase in salary from her school district—the University refused because she owed more than $6,000 in tuition.

Unwilling to pay her debt to the University—even though the increase in her salary would cover the whole tuition in less than two years, and she could have borrowed against that increase—and unable to obtain a transcript without payment, Kuehn filed a bankruptcy petition listing the University as a creditor. (Kuehn's lawyer had advised her that the University would have to provide her a transcript if she filed for bankruptcy.) While the case was pending Kuehn again requested a transcript, and the University again refused to provide one. After the bankruptcy court issued an order discharging her debt to the University, 11 U.S.C. §727, Kuehn yet again asked for a transcript and as before agreed to pay the transcript fee, but not the tuition. Again the University refused. Kuehn contends that the pre-discharge refusal violated the Bankruptcy Code's automatic stay, 11 U.S.C. §362(a), and the later one the discharge injunction, 11 U.S.C. §524(a), because the refusals were acts to collect her unpaid debt. Bankruptcy Judge Martin ordered the University to provide a transcript and pay damages and attorneys' fees. The district court affirmed. 2007 U.S. Dist. LEXIS 88191 (W.D. Wis. Nov. 30, 2007). It

followed *In re Merchant*, 958 F.2d 738, 741 (6th Cir. 1992), the only appellate decision on the subject—but, alas, an unreasoned one.

Section 362(a)(6) prohibits pre-petition creditors from taking "any act to collect, assess, or recover a claim against the debtor that arose before [the filing of a bank-ruptcy petition]" until the bankruptcy proceeding is closed or dismissed. Section 524(a)(2) "operates as an injunction against . . . an act, to collect . . . [discharged debt] as a personal liability of the debtor". Other subsections prohibit using legal process to collect, enforcing a pre-petition judgment, or exercising control over the property of the debtor. See §§ 362(a)(1)–(3), 524(a)(1)–(3). Kuehn argues that the University violated these sections when it refused to produce her transcript. According to her, because a transcript has no intrinsic value to the University, a refusal to provide one must be an act to collect. The University concedes that its policy is designed to induce students to pay their tuition, but it maintains that an "act to collect" for the purpose of the Bankruptcy Code is limited to a positive step, such as repossessing a car. A passive failure to do what the debtor desires is not an "act," the University submits. The University treats the transcript as a product that it is not obliged to sell to someone with whom it no longer wants to do business.

If Kuehn had attempted to purchase a transcript on credit, and the University, having been burned once, proved unwilling to make another loan, this would be an easy case. Sections 362(a) and 524(a)(2) apply only

when a creditor acts to *collect* a pre-petition or discharged debt. Although the failure to repay a debt factors into a credit score, the use of a credit score is forward-looking. Potential creditors consider creditworthiness to evaluate the wisdom of future transactions, not to collect unpaid debts. Any other entity deciding whether to extend credit would consider Kuehn's failure to pay, and the University may do the same.

Other sections of the Bankruptcy Code set out some circumstances in which creditors may not consider a debtor's prior bankruptcy filing. See 11 U.S.C. §366 (utilities may not refuse services if the debtor provides adequate assurance of payment within 20 days); 11 U.S.C. §525 (anti-discrimination provision applicable to employers and government entities). Otherwise, however, yesterday's failure to pay is a proper basis for tomorrow's refusal to extend credit. The Fair Credit Reporting Act permits bankruptcy filings to appear on consumer reports for 10 years from the date of discharge. See 15 U.S.C. §1681c. It follows that within 10 years from the date of discharge a prospective creditor may consider discharged debts in determining creditworthiness.

But Kuehn is willing to pay in advance for a transcript of her grades, and the University's only reason for balking is to induce her to pay for the education—yet that debt has been discharged. The University contends that it does not have a contractual obligation to provide a transcript and that, without an obligation, a passive refusal to deal cannot be an act to collect. It relies on *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16 (1995),

which it says establishes that refusal to deal cannot be an "act to collect". *Strumpf* held that a bank did not violate the automatic stay by placing a hold on a checking account while asking the bankruptcy court to lift the stay, so that the bank could set off the account's balance against an obligation the debtor owed to the bank. The Court concluded that a hold designed to maintain the status quo while the bankruptcy court considers the request does not violate §362. See 516 U.S. at 21. This does not imply that the bank could keep the account blocked no matter what happened in the bankruptcy, or even after a discharge. The Court concluded that the bank's delay was not an act to collect because it had a right under state law, a right preserved by the Bankruptcy Code, to set off the checking-account balance against the debt to the bank. That right would be undercut if the automatic stay permitted the debtor to drain the checking account while the bank's hands were tied. But money owed to a university cannot be set off against a transcript of grades—the two items are not of similar character, see *Boston & Maine Corp. v. Chicago Pacific Corp.*, 785 F.2d 562 (7th Cir. 1986)—and the University's refusal is not designed to afford time for judicial decision.

The district court applied what several courts have dubbed a "coercive effects" test: a creditor acts to collect a debt if it acts or fails to act, in a coercive manner, with the sole purpose of collecting that debt. This "test" can't be found in the Code, and situations to which it applies will be rare, because most acts or failures to act have multiple purposes, such as minimizing risk based on

creditworthiness. A rational creditor does itself no favors by refusing to engage in future transactions when the debtor will pay cash. See *In re Kmart Corp.*, 359 F.3d 866, 873 (7th Cir. 2004). If the creditor has competitors, the debtor will deal with them and the creditor loses profit. If the creditor has market power in the goods or services being sold, it will maximize its profit by setting a monopoly price for future transactions, not by trying to collect a debt. Pursuing bygones is a sure way to reduce future profits. If the University is not obligated to provide Kuehn a transcript, its best course of action is to sell the transcript for as much money as possible. That amount is unrelated to Kuehn's unpaid debt.

At oral argument we asked the University if it could charge Kuehn a large sum (say, 25% of the salary increase she stands to receive from her employer) for a transcript. It replied that it could not. That answer undermines its position that it has no obligation to provide a transcript to Kuehn. A provider of goods and services usually is free to charge whatever the market will bear. We could not find any laws or regulations limiting the price of college transcripts. So why does the University think that the fee for a transcript must be nominal, limited to the costs of printing and certifying the grades? Perhaps the answer is that providing a transcript is an implicit part of the educational contract, covered by the fee for the course hours, and that Kuehn therefore has a contract or property right for which she has already paid. (Well, she hasn't paid, but her obligation to do so has been discharged, so it comes to the same thing.) The University cannot charge Kuehn extra if the fee for instruc-

tion covers transcripts too. Then the University's refusal to certify a transcript of Kuehn's grades would be an act to collect the discharged debt and would violate both the automatic stay and the discharge injunction. See *In re UAL Corp.*, 412 F.3d 775, 778 (7th Cir. 2005).

Well, then, does Kuehn have a property interest because a certified transcript is part of the package of goods and services that a college offers in exchange for tuition? Property interests are created and defined by state law unless a federal law requires a different result. *Butner v. United States*, 440 U.S. 48, 55 (1979). Nothing in the Bankruptcy Code creates or alters property rights in grades or the right to receive a transcript. Other federal law addresses privacy concerns but not property interests. See 20 U.S.C. §1232g (Family Educational Rights and Privacy Act). What remain are state statutes and common law. See *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972).

Only one federal court of appeals (and no state supreme court) has considered whether a current or former student has a property right to receive a transcript. *Juras v. Aman Collection Service, Inc.*, 829 F.2d 739 (9th Cir. 1987), concluded that Montana's statutory definition of property does not give students property rights in transcripts. Montana defines property ownership as "the right of one or more persons to possess and use [a thing] to the exclusion of others". Mont. Code §70-1-101. The court concluded that because a university creates, maintains, and possesses the grade record to the exclusion of others it is the owner of the official transcript. The ninth

circuit's conclusion is questionable. Universities in Montana are limited by both state and federal law in what they can do with a student's grades. Mont. Code §20-25-515 says that a university "shall release a student's academic record . . . when requested by the student". This sounds like a rule that the student has a property interest in the information, even though the school also may use the data. (Shared property rights are common. Both landlord and tenant have property interests in the premises. Or think of land subject to an easement for transit.) But, right or wrong, *Juras* is unhelpful—Cardinal Stritch University is located in Wisconsin, whose law does not define property rights in the same way as Montana.

Wisconsin courts have not considered whether a student has a contract or property right to receive a transcript. No Wisconsin statute is on point. Under Wisconsin common law, property rights may arise from custom and usage. See *Delaplaine v. Chicago & N.W. Ry.*, 42 Wis. 214 (Wis. 1877) (riparian water rights); *Keogh v. Daniell*, 12 Wis. 163 (Wis. 1860) (movable fixtures). Universities have consistently provided transcripts at or around cost. A transcript currently sets students back $4 at Cardinal Stritch University, $3 at Harvard University, and nothing at the University of Chicago if delivered electronically (otherwise $12). Fees at other universities are similar. We could not find any case in any court where a university had asserted that it could charge a student more than cost for a transcript, and, as far as we can tell, no university has ever tried to profit by charging a fee based on the transcript's effect on a student's

future income. This custom is similar to those in *Delaplaine* and *Keogh*.

That Wisconsin has not previously recognized a right to receive a transcript does not affect our analysis. Since colleges don't treat registrars' offices as profit centers, the question has not arisen. What we need to know is how the Supreme Court of Wisconsin would handle it if it were to come up. And we think it likely—it is impossible to say more—that the state judiciary would deem the students and colleges to be joint owners of the data reflecting grades, because that is how the educational contract is routinely understood.

A longstanding custom or practice does not prevent change. For example, airlines used to carry checked baggage without a fee. But nobody, including the Supreme Court of Wisconsin, would conclude that United Airlines is depriving passengers of their property when it now charges for checked bags. The cost of checking baggage is determined by contractual rights that can be altered by the parties. Cardinal Stritch University could announce to future students that transcript fees would reflect the value of the education. But the University did not say any such thing to Kuehn when she enrolled, or even when she graduated, and it can't change the terms of a contract after the fact—even when those terms are implied rather than express.

Kuehn's property right might be limited to her grades, an intangible right similar to the right in a name or likeness, see *Hirsch v. S.C. Johnson & Son, Inc.*, 90 Wis. 2d 379, 280 N.W.2d 129 (Wis. 1979), and not include a right

to receive a transcript from the University certifying those grades. But the custom of universities has been to provide certified transcripts, and for good reason. Intangible grades are worthless without proof. Kuehn's school district increases compensation only after it receives a certified transcript. Other employers have similar policies. In *Hirsch* the Wisconsin Supreme Court relied on the property right in a football player's nickname to conclude that the tort of misappropriation was available at common law. It reasoned that the tort was necessary to give value to the property right. *Id.* at 383. See also *Baker v. Libbie*, 210 Mass. 599, 97 N.E. 109 (Mass. 1912) (a letter writer has a right to receive copies of a letter owned by another in order to give value to the writer's common-law property interest in the contents of the letter). That reasoning applies equally here. A right to receive a certified copy of a transcript is essential to a meaningful property right in grades.

That a student has a right to a copy of the transcript does not leave educational institutions without the means to collect tuition. The University is unable to collect Kuehn's tuition only because it was careless. When Kuehn failed to pay her mounting bills the University could have refused to let her enroll in new classes. It could have refused to let her take exams. It could have refused to award a degree. Or the University could have required Kuehn to borrow from a third party to pay for her education. Student loans are not dischargeable unless a debtor can show undue hardship, see 11 U.S.C. §523(a)(8), and it is unlikely that Kuehn could have shown undue hardship. She was gainfully employed, and her debt to the

University was substantially less than the extra income the master's degree afforded. Presumably the University will protect itself in one or more of these ways in the future.

Giving weight to custom that amounts to an implicit term of the educational contract, and following the reasoning in *Hirsch*, we conclude that Kuehn has a state-law right to receive a certified copy of her transcript. The University's refusal to honor that right until Kuehn paid her back tuition was an act to collect a debt and thereby violated the automatic stay and discharge injunction.

AFFIRMED